**George H. OUTING, Jr., Appellant,**

v.

**STATE OF NORTH CAROLINA,**
**Appellee.**

**No. 10926.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 9, 1967.

Decided July 21, 1967.

Frank N. Cowan, Richmond, Va. (Court-appointed counsel), for appellant.

Theodore C. Brown, Jr., Staff Atty., Office of Atty. Gen. of North Carolina, Raleigh, N. C. (T. Wade Bruton, Atty. Gen. of North Carolina, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and KAUFMAN and RUSSELL, District Judges.

HAYNSWORTH, Chief Judge:

In this habeas corpus proceeding, a North Carolina prisoner attacks a confession as involuntary. The case was here once before on appeal from a dismissal of the petition after a review of the record of the state trial. We reversed the summary dismissal,[1] because, while the state court judge made a conclusory finding that the confession was voluntary, there were no subsidiary findings resolving the underlying factual disputes. Upon remand, after a plenary hearing, the District Court made subsidiary findings resolving the factual differences against the prisoner's claims.

On this appeal, we must accept the subsidiary findings, because there is adequate support for each of them in the record, and we think they sufficiently support the ultimate finding that the confession was not involuntary.

Outing was contacted as a police informer. A taxicab driver had been slain with a knife-like weapon and robbed. His body was discovered in his taxicab early one morning in an area near a residential section in which Outing's parents lived and into which Outing, himself, and his wife had just moved. The detectives, searching for leads, sought Outing's assistance in identifying people who had been seen coming from the area in which the taxicab was found during the early morning hours on that day.

Outing gave them some leads and was requested to stop by the detectives' office that afternoon. Outing went there and gave the detectives some more information which was passed on to other detectives who attempted to verify the information obtained from Outing. Outing was carried home early that night, or part way home according to his testimony, and the next morning, a Friday, two detectives again contacted him. He agreed to go with them after they carried him to a store where he made some purchases and returned them to his wife. Outing's statements on Thursday about persons he had seen coming from the area where the taxicab had been found had all proven false, and on Friday he was confronted by his uncle and charged with lying. Outing, continuing to give the detectives bits of information, informed them that he had seen someone throw a knife into a wooded area in the general vicinity in which the taxicab was found in the early hours of Thursday morning. Two detectives took him to that area, and the three of them made a fruitless search of it, after which they returned to the detectives' office.

Because Outing had given them so much false information and because of his statement about having seen someone throwing a knife away at exactly the relevant time, the detectives thought that Outing probably knew something about the crime which he was concealing. They had him locked up in the police station. There was no arrest warrant. There was

1. Outing v. State of North Carolina, 4 Cir., 344 F.2d 105.

no charge, but at the cell door the detectives told the jailer in Outing's presence that Outing should be allowed to use the telephone to call whomever he wished, his wife, a lawyer, or a minister. In his testimony, Outing confirms the fact that he was given general permission to use the telephone, but denies there was any suggestion of whom he might call.

On Saturday, Outing was returned to the detectives' office and thence to the area which had been searched the night before. The detectives and Outing are all agreed that until then there had been no effort to extract a confession from Outing. Indeed, nothing had been said by the detectives to suggest that they thought or suspected that he had any direct involvement in it. Except for having been kept in jail Friday night, he was being treated as the cooperative informer he purported to be. When he was questioned, it was about the activities of others, but on Saturday afternoon he changed his story of the day before about having seen someone throwing a knife away to claim that he had been paid three dollars by someone else to dispose of a French knife. In the area being searched, he ultimately led the two detectives to a manhole and, when the cover was removed, there was disclosed a French knife such as he had described.

The detectives summoned a photographer to take pictures of the knife before its removal and, at least, one other detective arrived on the scene with him. After the pictures had been made, the newly-arrived detective, Fesperman, who had not previously talked to Outing, fired his pistol once or twice, according to the detectives, two or three times, according to Outing.

Here, for the first time, there is wide divergence in the testimony. According to Outing, Fesperman fired in his direction, after which he told Outing that if he did not confess to the murder "the same thing is going to happen to you." According to the detectives, Fesperman was some thirty feet from Outing. One of the detectives was standing with Outing in apparently idle conversation, and the other two were, generally, in between Outing and Fesperman. They were in a wooded area. Fesperman said he had some old ammunition, and he wished to see if it would fire. He fired into a thicket at some flash bulbs which had been discarded by the photographer, the direction of the fire being away from Outing. The detectives stoutly deny that anyone said anything to Outing resembling the words attributed by him to Fesperman. Indeed, according to the detectives, there was nothing in the firing incident calculated in the least to frighten or intimidate Outing.

After Fesperman's firing of his pistol, one of the detectives walked with Outing out of the wooded area. They sat down on a grassy bank by a road. Outing told the detective he could see his father up on the hill and, according to the detective, presently said that he would like to "get the mess over with" and would like to talk to his wife. Outing confirmed the fact that he asked to speak to his wife without reference to any general declaration that he would like to "get the mess over with."

In any event, Outing was returned to the detectives' office, and his wife was brought there. The two were placed in a room where they could converse privately, whereupon Outing escaped through a window.

The next morning, Sunday, Outing was arrested at the home of a relation of his wife. After his return to the detectives' office, according to Outing, he was struck and told that if he did not confess, Detective Fesperman would shoot him. According to the detectives, nothing of the sort occurred. He was told that he need say nothing and anything he did say could be used against him, whereupon, after a very short period of questioning, he confessed to the murder-robbery. He refused to sign a written version of his oral confession, but told his father of the crime later that morning.

The only real disputes in the testimony concern Fesperman's firing of his pistol in the woods and what happened on Sunday morning immediately preceding the

confession. The District Court accepted the detectives' version of both events. Their clear, positive testimony supports the findings.

We are left then with a case in which the only hallmark of coercion is the illegal detention Friday night[2] and Saturday until his escape on Saturday evening. There was no probable cause to arrest him or to charge him with any crime. The illegal detention was not an incommunicado one, however. While Outing denies that anyone referred to his calling a lawyer, he readily agreed that he and the jailer both understood that he could call whomever he wished. On Saturday afternoon when he asked to see his wife, his request was promptly granted. There is not even a claim of coercive questioning of him during that period. The record discloses no questioning of him whatever on Saturday after the shooting incident. If the detective who testified that, as the two sat on the bank, Outing, after referring to the fact that he could see his father in the distance, expressed a wish to "get the mess over with," understood this as a statement of a purpose to confess, he did not then pursue it. The record discloses no questioning whatever of Outing after that remark, if it was made, until after he had seen his wife, escaped, and was recaptured on Sunday morning.

It is perfectly plain from the entire record that, from the outset, Outing had a compulsive impulse to involve himself. Out of an excessive enthusiasm for his role as informer and assistant to the detectives, he immediately responded with information concerning others, all of which ultimately proved to be false. Not content with leaving matters as they were, he persisted in an apparent effort to prove his worth and usefulness by giving additional information, some of which ultimately involved himself with the disposition of the knife. It may have been an act of stupidity,[3] but he, himself, kept the conversation going, involving himself when further false information about others would no longer suffice. A confession was the inevitable conclusion of the course he had set for himself, and it well may be that by Saturday afternoon he had come to a tentative decision to tell the whole story after talking to his wife. All of this is quite apart from any sense of oppression or coercion from any conduct of the detectives. At least, when we accept the District Court's resolution of the testimonial conflict about Outing's claims of crude physical threats and violence, we are unable to say that the single circumstance of the illegality of the detention Friday night and Saturday and the probable illegality of his arrest on Sunday morning required an ultimate conclusion that the confession on Sunday was involuntary. Indeed, Outing's testimonial claim was that his asserted sense of fear and coercion was born only with the shooting incident, as described by him, on Saturday afternoon.[4]

As we have indicated, the record conclusively shows that while detained Outing knew that he could call whom he pleased. When he asked to talk to his wife, he was permitted to do so, and, until Sunday morning, he was never subjected to any questioning which appeared

2. According to Outing, he was told that he was being detained overnight to assure his being available to the detectives the next morning for continued assistance as their informer.

3. Outing was an eighteen-year-old Negro youth, but married and employed. He had some reading and writing skills. The extent of his experience as a police informer is not disclosed.

4. Outing's first verbalization of a possible wish to confess came shortly after the shooting incident, but that sequence of events is insignificant for several rea-sons. The shooting incident, accepting the detectives' version, was so innocuous that it was not calculated to have any effect upon Outing's will. The two events were separated by other activity, including a quiet conversation about Outing's father whom Outing and the detective were watching. The more likely trigger was discovery of the knife, which also shortly preceded the statement. Finally, his statement of a wish to get "the mess over with" after talking to his wife was not the first indication of his purpose to involve himself, for that was evident in his course of conduct from the outset.

designed to extract a confession or to elicit information incriminating himself. On Sunday when he was questioned about his own involvement, he was first told that he could remain silent.[5] In light of the District Court's resolution of the disputed testimony, there is no reason to suppose that he had any reason to think that he could not exercise the right if he wished to do so. The promptness with which he confessed thereafter rather tends to indicate that his purpose to involve himself in the case, which was apparent from the outset, had come to its fruition.

 He was tried before Escobedo [6] and Miranda.[7] The new rules developed in those cases with respect to the right to counsel do not apply here.[8] The case turns entirely on the question of voluntariness of the confession. The indicia of coercion here are minimal when contrasted with the comparatively aggravated circumstances which the Supreme Court has found to compel an ultimate inference of involuntariness.[9] If the District Judge, after resolving the conflicts in the testimony, as he did, had, nevertheless, drawn an ultimate inference of coercion, we might have sustained that finding,[10] but the ultimate inference was initially for the District Judge to draw. His ultimate finding is not clearly erroneous as an inference of fact, and it was uninfluenced by any erroneous view

of the law. It, as well as the subsidiary findings of fact, was made by the District Judge after observing the witnesses. Since that ultimate inference of voluntariness was a permissible inference, we accept it.

Affirmed.

FRANK A. KAUFMAN, District Judge (dissenting):

"The trial of this case was prior to the date of decision of Miranda v. [State of] Arizona, 384 U.S. 436, [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), the requirements of which, therefore, are not directly applicable, Johnson v. [State of] New Jersey, 384 U.S. 719 [86 S.Ct. 1772, 16 L. Ed.2d 882] (1966), although relevant on the issue of voluntariness, Davis v. [State of] North Carolina, 384 U.S. 737 [86 S. Ct. 1761, 16 L.Ed.2d 895] (1966)." Clewis v. State of Texas, 386 U.S. 707, 87 S. Ct. 1338, 1339, 18 L.Ed.2d 423 (1967). That comment is as applicable here as in *Clewis*. The majority opinion in this case answers in the affirmative the question: "Is the confession [of Outing] the product of an essentially free and unconstrained choice by its maker?" Culombe v. Connecticut, 367 U.S. 568, 602, 81 S. Ct. 1860, 1879 (1961) (opinion of Frankfurter, J., joined by Mr. Justice Stewart). I respectfully disagree and would reverse on the ground that the "totality of the

5. Outing made only one statement, the oral confession. He declined to sign or adopt the subsequently prepared writing. When, therefore, the detectives testified that he was told of his right to remain silent and warned that any statement he made could be used against him before Outing "made his statement," they must have been referring to the oral confession. The matter was not pursued in the District Court, because everyone apparently understood the testimony to have the meaning attributed to it by the District Judge. Outing's lawyer in this Court so construes it. If we now find some possible ambiguity in the testimony on the point, we are not authorized to proceed upon an assumption that the warnings were vapid formalisms following the oral confession, for the natural reading of the testimony abundantly supports

the District Court's finding that the warnings preceded the oral confession.

6. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

7. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

8. Johnson v. State of New Jersey, 384 U. S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

9. See Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653; Haynes v. State of Washington, 373 U.S. 503, 83 S. Ct. 1336, 10 L.Ed.2d 513; Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037.

10. See Ledbetter v. Warden, Maryland Penitentiary, 4 Cir., 368 F.2d 490.

circumstances"[1] requires the conclusion that Outing's confession was involuntary and should have been excluded at his trial as "testimonially untrustworthy."[2] I suggest that a review of the record in this case clearly negates the factual conclusion that Outing, a seventeen or eighteen year-old Negro, was a "cooperative [police] informer" who out of a "compulsive impulse to involve himself" and "out of an excessive enthusiasm for his role as informer and assistant to the detectives"[3] got "caught in a web of his own weaving [and] apparently thereafter confessed."[4] To the contrary, the record discloses that Outing got caught in the "web" of his own lies after the Charlotte police themselves first involved Outing in their investigation on Thursday, November 17, 1960, and then continuously incarcerated him from early Friday morning until he confessed on Sunday (except for the hours he was out of their custody following his escape Saturday afternoon), meanwhile affirmatively and negatively failing to follow accepted police practices, North Carolina statutory commands, or constitutional standards. When all the circumstances are considered together, it is not possible for me to conclude that Outing's confession was "the expression of free choice." Watts v. State of Indiana, 338 U.S. 49, 53, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (opinion of Frankfurter, J., joined by Mr. Justices Murphy and Rut-

ledge); see also Collins v. Beto, 348 F.2d 823, 833 (5th Cir. 1965) (concurring opinion of Friendly, J., sitting by designation). In applying the "totality" test "a detailed account [of the relevant circumstances] is unavoidable." Culombe v. Connecticut, supra, 367 U.S. at 606, 81 S.Ct. at 1881 (opinion of Frankfurter, J., joined by Mr. Justice Stewart).[5]

### Thursday, November 17, 1960

The body of James T. Hamilton, a white male taxi driver for the Charlotte Yellow Cab Company, was found in his cab in the early morning hours of Thursday, November 17, 1960. Hamilton had been killed with a knife.[6] All of the personnel of the Charlotte Detective Bureau were promptly put on the alert and assigned to work on the case after Hamilton's body was found. Lieutenant (later Captain) O. A. Crenshaw, who was in charge of the investigation, directed that a house-to-house canvass be made of the neighborhood adjacent to the area in which the body had been found. Detective C. A. Allen testified that "they instructed us all if we knew any informers in the neighborhood to try to talk to them and see when the cab had come in there, and so on."

In carrying out Crenshaw's instructions Allen went to the petitioner's home, talked with Outing and Outing's pregnant wife, and asked Outing to help them

1. Clewis v. State of Texas, supra, 386 U.S. at 708, 87 S.Ct. at 1339; Fikes v. State of Alabama, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). See also Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761 (1966); Haynes v. State of Washington, 373 U.S. 503, 83 S. Ct. 1336 (1963).

2. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 1453, 18 L.Ed.2d 527 (1967), quoting 2 J. Wigmore, Evidence § 822, at 246 (3d ed. 1940).

3. Quotes from the majority opinion in this case of Chief Judge Haynsworth.

4. State v. Outing, 255 N.C. 468, 121 S.E. 2d 847, 850 (1961).

5. Professor Kamisar, in criticizing the "voluntariness" test as a workable judi-

cial standard in confession cases, has emphasized the importance of a detailed inquiry into the factual circumstances surrounding the confession in cases to be decided under that standard. Y. Kamisar, A Dissent from the Miranda Dissents: Some Comments on the "New" Fifth Amendment and the Old "Voluntariness" Test, 65 Mich.L.Rev. 59, 101–02 (1966).

6. At the conclusion of the hearing below, the District Court found the following as facts:

The dead body of James T. Hamilton, a taxi driver for Yellow Cab Company of Charlotte, North Carolina, was found under the wheel of his cab on the morning of November 17, 1960, near the dead end of Celia Avenue in the outskirts of Charlotte. He had been stabbed. [District Court's Finding No. 1].

find out who had done the killing.[7] Outing testified that the first thing Allen said to him on that occasion was to ask him (Outing) if he (Outing) would help him (Allen), "and I told him I would help him the best I knew how." Outing testified that his sister had told him (Outing) that a man had been found dead but that Allen didn't say anything to him (Outing) about the finding of Hamilton's body. Outing testified that the conversation with Allen "was about people who I had seen that night," that Allen asked him "to describe the guys I saw that night" and that Allen "didn't say they'd [the people Outing had seen] done nothing." Outing testified that he told Allen whom he had seen that night. Allen testified that Outing said he would help and that Outing had said "he would like to get part of the reward money" which had been posted by the cab company. Allen testified that Outing "gave me a list of who he had seen that night" and that "he [Outing] named five or six different ones, and we run them down and had them picked up that night."[8]

Outing testified that when his sister told him (Outing) about the discovery of Hamilton's body, a lady named Mrs. Clyde Miller who lived in the neighborhood had "overheard a conversation that I had with my sister about seeing some guys coming in front of my mother's house on the 17th day of November, which was on a Thursday; and she told, I guess, Mr. Allen about it." Outing testified that after his conversation with Allen at his (Outing's) home "we went down to Mrs. Clyde Miller's * * * and sit there in her living room; and he [Allen] told me about a reward that the Yellow Cab Company were offering." Outing testified that he told Allen everything he knew "and so Mrs. Clyde Miller, well, she told me, she say 'Well, anything else you know would help him [Allen],' say 'you tell him.'" Allen testified that Outing knew about the reward when he (Allen) arrived at Outing's home, that "the word had got out that the Yellow Cab Company had put out a reward," and that he (Allen) didn't "know how he [Outing] heard the Yellow Cab Company had put out a reward for the killer * * *." Allen's testimony contains no reference to Mrs. Clyde Miller or to his having gone anywhere with Outing on this occasion. Outing testified that he talked with Allen on this occasion between 2:30 P.M. and 3:00 P.M. and that the conversation lasted "approximately a half an hour, maybe wasn't even half an hour."

Allen testified that he returned to Outing's home later that day and talked with Outing and Outing's wife. Allen testified that upon that occasion Outing's wife told her husband "Why don't you go ahead and tell them the truth?" Outing's testimony contains no reference to Allen's having made a second trip to his (Outing's) home that day. Allen testified that on his second visit to Outing's home he asked Outing to come down to the station the next morning and "give us some information." Outing testified that Allen gave him (Outing) his (Allen's) card "and told me to come down to the police headquarters."[9]

7. At the time of the events of November 1960 Outing was either a seventeen or an eighteen year-old Negro who was employed as a dishwasher.

8. The District Court found as facts the following:

Petitioner, a former police informant who had just moved to Celia Avenue near where the body was found, was contacted by Charlotte police on the afternoon of Thursday, November 17, 1960, for any information he might have regarding the crime; petitioner gave officers the names of various people he had seen in the area the previous night; all the people named were later investigated by police, and satisfactorily accounted for their whereabouts. [District Court's Finding No. 2].

9. On Outing's appeal from the conviction at his trial, the North Carolina Supreme Court stated that:

They [the officers] went to his home on the afternoon of November 17 (Thursday) and he seemed reluctant to talk in the presence of his wife who 'wanted him to be quiet,' so the officers asked him to come to police headquarters for an interview. One of the officers left his card with the defendant. [121 S.E.2d 847].

Allen testified that he returned to Outing's home that night, picked him up and took him to the station. Outing testified that he went to the station that night by bus.

Allen testified that he formed his opinion concerning Outing's involvement in the crime "after talking to another informer in the neighborhood that night; that George knew more than he was telling us and knew something about it." [10] According to Allen, Outing "was with us that night a good part of the night." Detective Jack W. Porter, who did not himself question Outing that night but who testified that Outing had been an informer to other detectives in the Bureau on prior occasions, remembered "working most of the night as a result of what he [Outing] had said to the other detectives." Detective Porter also recalled that they "worked all day Thursday, all night Thursday night * * *." The detectives ran down the names given them by Outing. Detective Allen testified that "we picked up colored people all during the night, had five or six, and one of them was about to whip George for lying on him, and George said he lied on him after that * * *." Allen testified that all of the names furnished by Outing "panned out to be lies" and that Outing admitted he was lying. At an undeter-

mined time during the night, Allen drove Outing from the Detective Bureau to the bus line and Outing returned home.[11]

Allen stated that he was only talking to Outing in the latter's capacity as an informer. Allen was asked on direct examination if he had ever advised Outing that he did not have to talk and if he advised Outing of any of his constitutional rights. Allen did not testify that he ever at any time advised Outing of any of those rights. [12]

### Friday, November 18, 1960

On Friday morning Detective Allen's wife received an anonymous telephone call from someone who asked that Detective Allen call a certain number. Detective Allen, who was at home, placed the call at approximately 7:30 A.M. and "was informed that George Outing was the man we wanted * * *." Allen testified that the information was "very reliable" and that he was told that Outing "knew where the knife was, that he had been seen up in that vicinity," but that the informer didn't tell him that Outing had committed the crime. Allen did not identify the informer by name but stated that the informer was an 80 year-old woman. According to Allen, Outing was supposed to have reported to police headquarters at 7:00 A.M. on Friday morn-

---

10. The North Carolina Supreme Court stated:

 About four o'clock on the afternoon of the 17th the city officers, acting on a tip, interviewed George Harold Outing. * * * In substance, the officers testified they had information the defendant might know something that would aid 'in breaking the case.' [121 S.E.2d 847].

 Neither the opinion of the North Carolina Supreme Court nor the transcript of Outing's trial in the State Superior Court (hereinafter referred to as the "trial court") reveals the nature or source of the purported "tip" or "information."

11. The North Carolina Supreme Court stated:

 About nine o'clock that evening he reported to police headquarters for an interview with the officers. During the course of the interview he said he saw three boys at the corner of Celia

Avenue and Rosetta Street as he came home from work about 1:30 a. m. He gave the name of one of the boys. He stated one of them had a long knife. The officers took him on a tour of the neighborhood, contacted the boy whom he had named, investigated the boy's alibi and released him. Outing then named others, including his uncle, who he had seen in the vicinity on his way home. At the end of the interview the officers permitted him to go home. [121 S.E.2d at 848].

12. The District Court found as facts the following:

 Petitioner was interviewed on Thursday, November 17, 1960, as an informant, and he was not advised on that day that he was entitled to a lawyer, or that he could remain silent, or that anything he said could be used for or against him in court. [District Court's Finding No. 3].

ing but "he didn't come." Allen testified that "on information that I got on the telephone at approximately 7:30 in the morning, I called the police station and had them have two men pick him [Outing] up." [13] According to Outing he was picked up by two detectives in a car at around 7:30 or 8:00 that morning as he walked up the street toward his mother's. Outing testified that the detectives told him they wanted him "down at police headquarters, said Mr. Allen wanted to see me down there again." The detectives did not, according to Outing, tell him that he was under arrest, and after a brief stop at his home Outing was transported to the station.

Outing testified that he was at the station at about 8:00 A.M. and that he was questioned by an officer or officers whom he was unable to identify but that he was not accused of being the killer. Allen indicated that he did not himself question Outing that day or thereafter. Allen did testify, however, that he relayed the information he had received over the telephone to Crenshaw. When Detective Porter and W. O. Homberg arrived at the station on Friday morning they were asked by Lieutenant Haney to talk with Outing. Homberg testified that he had seen Outing in the area in which Outing lived on Thursday and Porter testified that he believed he had seen Outing talking with Allen at the Detective Bureau on Thursday. Neither Porter nor Homberg had talked to Outing on Thursday. Homberg testified that they were told Outing was "an informer." Neither Porter nor Homberg remembered the approximate time they began questioning Outing Friday morning, but Outing thought Porter first talked to him at about 11:30 or 12:00. Outing stated that Porter first talked to him "a little later" that same Friday, i. e., after the

questioning by the unidentified officer or officers earlier that morning, and Porter stated that he believed "someone had already talked with him [Outing] that [Friday] morning." Porter further testified that when he first talked with Outing he did not know whether or not Outing had been arrested for the murder of Hamilton.

Outing testified that on Friday morning he was requested to take a lie-detector test. He stated that he believed Homberg had made the request. He testified that he then requested a lawyer "because they wanted me to take a lie-detector test." He testified that his request for counsel was made in the presence of Porter and Homberg and that "they told me I wouldn't need a lawyer just to take a lie-detector test." He testified that he then took the lie-detector test in the presence of Porter, Homberg and "the man who was giving the test" but did not know of the results of the test. Outing testified that he took the lie-detector test in the city jail, that he did not go out of the building to do it and that "it was downstairs somewhere." Outing testified that in taking the test "they put something around my arm and something in my hand, and told me to relax and he would ask me a question and the only thing I could say was yes or no." Porter testified that they asked Outing to take a lie-detector test but that Outing refused to do so. Porter could not remember when this happened but that Outing was asked to take the test "to determine if he was lying" and "as an aid in our interrogation." Porter testified that Outing did not take such a test, that "you had to go out of the building to get to" the police department's polygraph apparatus, that he was not too familiar with the apparatus and that part of the apparatus consisted of "a thing

---

13. In the trial court Allen testified that he did not recall the time at which he had Outing picked up on Friday morning but that "the arrest sheet will show what time he was picked up." Porter testified at the trial that Outing "had been placed under arrest Friday" but that he (Porter) did not know who had placed

him under arrest. The North Carolina Supreme Court stated:

On the following day (Friday) after checking as many of those named by the defendant as could be found, and finding nothing connected them with the crime, the officers took the defendant in custody. [121 S.E.2d at 848].

to fit on his finger" but that it was not held in the hand. Porter testified that Outing made no request for counsel when he was asked to take the lie-detector test nor to his knowledge at any other time during the investigation.[14]

The record discloses very little concerning the early questioning of Outing by Porter and Homberg. Outing testified that he was questioned and that no one accused him of being involved in the crime.[15] He also indicated that he was neither "questioned * * * real hard or threatened * * * at any time during Friday." Porter testified that at this time Friday Outing was an "informant" and "would tell us about people that were involved, and we would go out and find them and interrogate them, check the alibis, and so forth." Porter also stated that "most of the conversation that day was in regard to information he was giving us that we were checking out * * *."

It appears that at some point during Friday Outing was questioned by Detectives Dixon and Stroud. The record does not disclose the time or times when such questioning took place. Porter testified that on Friday night Outing told Dixon and Stroud that he would take them and show them where "the knife" was. Porter testified that Dixon and Stroud "came in and said that Outing wanted to show them where the knife was, and asked us if we would go with them, and we did." Homberg testified that Outing "was going to take us out and show us a bayonet-type knife that

he had seen and had covered up with leaves." Outing denied that he had told "the officers there was a knife out there."

Detective Porter testified that at the time they left to go out and look for the knife he suspected that Outing "was either involved or—he had knowledge of it or was involved, one of the two * * *." He stated that he "became suspicious when we ran down lead after lead that he had given us and nothing panned out." He indicated that he thought Outing was lying and had formed an opinion that Outing must be involved in it. Porter stated that he "suspected him of having knowledge or being involved, maybe not alone." Porter testified, however, that he did not remember that during Friday he had questioned Outing regarding Outing's participation in the robbery or murder.

Detectives Porter, Homberg, Dixon and Stroud took Outing to a wooded area near where the body of Hamilton had been found on Thursday and near where Outing lived. A portion of this area was described by Porter as being "a real thickly—almost like a jungle—honeysuckle, thickets, and briars, and so on * * *." The Friday trip to the wooded area took place at night. Neither Porter nor Outing were able to recall at what time Outing was taken to the wooded area. Porter, however, testified that "it was dark." Outing testified that he didn't know why he was taken to the area though he had asked why. Outing further testified that he was handcuffed

---

14. Neither the District Court nor the Supreme Court of North Carolina made any reference to the alleged lie-detector test. As Outing's trial, however, Porter testified that prior to Sunday morning Outing had "refused" to take a lie-detector test but that on Sunday morning he (Outing) agreed to take such a test in order to help the detectives find Hamilton's money pouch.

15. In the trial court Outing testified that on Friday morning Porter and Homberg "asked me about the boys I seen and I told them, and they kept on talking to me and I told them I did not know anything about it, and they asked me did I

know anything about it and I told them no, and he kept on talking and asking me questions about the boys who I had seen and I could not give them anymore information at that time, and I asked could I go, I had something to do." The District Court found as facts the following:

On Friday, November 18, 1960, petitioner was brought by officers to police headquarters, where he again was interviewed for any information which he might have about the crime; although petitioner was not questioned about his participation in the crime, he was considered by police as a suspect. [District Court's Finding No. 4].

at that time. Porter, when asked in relation to the events which occurred on Saturday if they had been handcuffing Outing wherever they had carried him, testified that he didn't "recall if we had handcuffed him before * * *." None of the testimony offers details as to what transpired in the woods Friday night. Homberg testified only that Outing "carried us out there and put us on a rabbit hunt, that's all." Nor does the record disclose whether or not Outing was informed that he did not have to go with the detectives to the wooded area on Friday night. According to Porter they "weren't gone but a short while." Porter testified that he could not recall what time it was they brought Outing back from the woods.[16]

Upon returning from the wooded area that night Homberg and Porter locked Outing up in a police cell. Homberg testified that Outing was placed "in custody" at this time. Neither Porter nor Outing remembered what time it was when Outing was placed in jail that night. Homberg testified that to his knowledge Outing had not been arrested when they locked him up Friday night. Homberg testified that they thought they had somebody who knew something about the murder. Homberg testified, "I suspect I would have to say that he [Outing] was being held as more of a material witness than he was a person that was to be charged with the crime." When asked why they didn't let Outing go home Friday night Homberg testified: "I don't recall." Porter indicated that at that time Outing had

been arrested "for investigation" and testified that "he was being held for investigation of this [Hamilton's] murder." Detective Porter testified that he didn't know who made the decision to keep Outing in custody that night or who ordered Outing's commitment. Porter testified that he believed "that an arrest sheet had already been made on him [Outing] at that time" but was not sure who had filled it out. Porter further testified that a warrant had not been served on Outing at the time he was locked up. Homberg testified that an arrest warrant charging Outing with the murder was first drawn up after Outing's escape on Saturday and that to his knowledge it had not been served at the time Outing made the confession on Sunday.

Porter testified that he told Outing "that he was being held for investigation of this robbery and murder." Porter testified that he was not sure whether he told Outing Friday night that he (Porter) suspected him (Outing) of being a participant in the murder.[17] Porter testified that to his knowledge no one else told Outing Friday night that he was being held for investigation as a participant in the murder. Outing testified that he asked Homberg why he was being locked up but that Homberg wouldn't say beyond telling him that he was being locked up "for Saturday morning, because they wanted to talk with me 'in the morning.'" Outing also testified that he had not been accused of being the killer.

Porter testified that when they got to the cell door Homberg told the jailer to

16. The District Court found as facts the following:

Petitioner on Friday, November 18, 1960, told officers he had seen someone throw the murder weapon, a knife; he led officers on Friday night to a wooded area where he said he could locate it, but the search was to no avail. * * *. [District Court's Finding No. 5].

The District Court made no finding with regard to the alleged handcuffing of Outing on Friday night. The Supreme Court of North Carolina made no reference at all to the Friday night trip in

its opinion. Homberg testified in the trial court that Outing told Dixon and Stroud about the knife at "approximately 9 o'clock Friday evening * * *."

17. At the trial Porter testified that "we let him [Outing] know on Friday morning after we had talked with him that we thought he was involved in this crime." Porter further testified that "I can't tell you the exact words we used * * * but * * * this will give you an idea of how it went, we said that 'After questioning you after some of the things you have told us, that you would have had to be there in order to know these things.'"

allow Outing "to call anyone that he wishes to call, his minister, his family, or an attorney, and to let him see anyone that came to the jail to see him." Porter testified that Homberg made this statement in the presence of Outing, the jailer, and himself. At another point Porter testified that "we simply told the jailer to allow him to make any call to anyone that he wished to make it to." Outing testified that he was told in front of the jailer that he could make a telephone call if he wished, "but to whom they didn't say." Outing testified that "they didn't tell me about calling me no lawyer." Outing testified that he (Outing) "didn't know any lawyers there in Charlotte." [18]

Porter testified that Outing was not advised at this time that he had a right to an attorney. Porter testified that he did not tell Outing that he did not have to say anything. Porter and Homberg also testified that no one had told Outing that anything which he did say could be used against him.[19] Homberg testified that no bond was set for Outing by Friday night and that he was not carried before a magistrate.

Both Porter and Homberg testified that at some time Friday evening (whether before or after the trip to the woods that night is not apparent) Outing's "uncle confronted him [Outing] and told him that he was telling a lie on him [Outing's uncle]." Homberg testi-

fied that the person who came to the station on this occasion was one George Williams, who Outing identified as his uncle, but that George Williams said that Outing was his son. Outing denied that his uncle came to the station on Friday night, denied that George Williams was any relation to him, and testified that he didn't know if George Williams had come to the police station on Friday night. Homberg testified that in his opinion Outing was an informer up until Friday night. Homberg testified, however, that at the point when Outing was confronted with George Williams he first formed an opinion that Outing "could have been involved in it or knew about it." Homberg testified that at that point he "felt like he [Outing] was involved or that he knew more than he was letting on." Porter had formed such an opinion before the trip to the wooded area Friday night (see above) and testified that he suspected Outing to be the "prime suspect" in the case from Friday. Homberg testified that Outing's confrontation with his uncle and "the other leads he had given us to check out" gave them "reasonable grounds to believe" Outing to be a suspect as such in the case.[20]

Porter testified that he worked late Friday night. Outing testified that after he was put in jail that night no one questioned him about the case or otherwise during the night.[21]

---

18. The District Court found as facts the following:
 [P]etitioner was lodged in jail Friday night, and the jailer, in petitioner's presence, was told by Officer Homberg to permit petitioner to call his family, a minister, or a lawyer, and that anyone should be permitted to see him. [District Court's Finding No. 5].

19. The District Court found as a fact that "petitioner was not advised on Friday of any constitutional rights." (District Court's Finding No. 6).

20. The District Court found as a fact that "By Friday night, November 18, 1960, police had reasonable grounds to believe that petitioner was involved in the crime * * *." (District Court's Finding No. 6).

21. The cell in which Outing was locked up on Friday night was located in the Charlotte City Jail. At the trial Porter testified that after the preliminary hearing in the City Recorder's Office Outing was transferred to the Mecklenburg County Jail. Porter did not remember the date of the second preliminary hearing but did remember that Outing was represented by counsel at that hearing. Since Outing did not obtain counsel until some undetermined time after the events of Sunday, November 20, 1960, it is apparent that Outing was transferred to the Mecklenburg County Jail sometime after that same date. Homberg also testified at the trial that Outing was supposed to have been transferred to the County Jail after the preliminary hearing.

*Saturday, November 19, 1960*

Outing testified that "they" started questioning him again on Saturday "early in the morning * * *." Porter testified that he slept late Saturday morning and that he first saw Outing late that morning. Homberg was unable to give an approximation of the time at which he reported for work Saturday morning, but testified that when he and Porter did report for work they "were assigned to interview and interrogate George Outing" and indicated that at that time Outing was placed in their exclusive custody. Homberg testified that the case "was discussed [apparently either on Friday night after the trip to the wooded area or on Saturday morning] with our supervisors, and from that time on, from Saturday morning on, George Outing was our prisoner." Porter testified that he did not know whether or not Outing had been questioned between the time he and Homberg locked him up Friday night and the time they saw him Saturday morning.

After taking Outing out of the lock-up, Porter testified that he and Homberg went out and bought Outing and themselves breakfast. At around noon or one o'clock that afternoon Detectives Porter and Homberg took Outing back to the wooded area they had visited Friday night. Outing testified that he was handcuffed when they left the police station. Porter testified that he and Homberg took Outing back to the wooded area on Saturday because "he told us Saturday that he wanted to take us and show us where the knife was." Outing testified that he and the two detectives went to the street on which Outing lived and Homberg removed the handcuffs. Outing testified that the three of them proceeded past the apartment where Outing lived and then down to the place where Hamilton's body had been found. Outing testified that Homberg then asked him if he knew where the cab had been found and that he (Outing) had answered in the negative and that Homberg had said "Well, the cab was found right along in here somewhere." Outing testified that "Then we went on up through the woods." Outing testified that Homberg (he believed it was) told him: "George, we believe that you know something about it." Outing testified that he had responded: "Well, I don't know anything about nothing." Outing testified that Homberg then said: "Well, we done checked you out and found everything you told us not be true." Outing testified that he then said: "Well, I can't help that. I told you what I seen." When asked when Outing had first been "directly accused of being involved in the killing itself," Homberg testified: "I guess you would say after he had escaped [on Saturday] and been apprehended [on Sunday]."[22] Porter testified that after they took Outing into the woods on Saturday afternoon that he (Porter) told Outing "that I thought he was involved, that he knew too much about this thing not to be involved." It is unclear from Porter's testimony as to the precise time he made this statement to Outing. Porter testified that prior to Outing's being taken to the wooded area on Saturday no one had advised Outing in his (Porter's) presence that he (Outing) did not have to take the detectives to the woods or that he did not have to say anything he did not wish to say or that anything he did or said could be used against him in a criminal action. Homberg's testimony was that Outing was not advised of his constitutional rights in his (Homberg's) presence until Sunday morning.

Porter testified that Outing led the detectives to a spot in the woods "where he said he [Outing] thought he [Outing] threw the knife." Porter testified that the next "three hours or several hours" were spent "going from one place to an-

---

22. Both Porter and Outing testified in the District Court that Homberg accompanied them to the wooded area on Saturday and that he was present during the shooting incident described below though neither Porter nor Outing could pinpoint Homberg's position at the time the shots were fired. Homberg gave very little testimony concerning the events of Saturday afternoon.

other that he said he threw the knife." Outing testified that after he had told Homberg he "didn't know anything about it" that "we kept prowling around in the woods until we run across this manhole." Porter testified that Outing had led them to the "manhole cover * * * where he said a boy gave him $3.00 to hide this knife." Outing testified that he had not told Homberg or Porter that a knife was in the hole or that anyone had given him money to hide a knife. Porter testified that "we took the manhole cover off and there was a large French knife." [23] Outing testified that he assisted in taking the manhole cover off but stood back while Homberg or Porter looked into the hole and that Homberg or Porter "said something about, 'there's the knife there.'" Outing testified that he himself did not look in the hole and never saw the knife in the hole. Porter testified that when the knife was found he didn't believe that someone had paid Outing to dispose of it.

Porter testified that "after the knife was found, we called for identification officers to come down and photograph the knife." According to Porter: "Shortly after, Mr. Fesperman came down * * * ." [24]

Homberg testified that to his knowledge Detective Fesperman had not had any prior conversation with Outing during the course of this investigation. Outing testified that he had not seen Fesperman prior to Saturday. Apparently Fesperman and a photographer arrived at the scene accompanied by other detectives, though how many is not clear.

Homberg testified that when Fesperman arrived he (Fesperman) said "What have we got here?" and that he (Fesperman) had then looked down into the manhole to observe the knife. Homberg tes-

---

**23.** The District Court found as facts the following:

On Saturday, November 19, 1960, officers returned with petitioner to the wooded area visited on Friday, and after a search of some three hours petitioner led officers to a manhole where he said he had been paid to conceal the knife; and upon removal of the manhole cover the weapon was found there. [District Court's Finding No. 7].

At the trial there was independent evidence connecting Outing to the knife which was summarized by the North Carolina Supreme Court as follows:

The State called as a witness Mr. Conrad Taylor who testified that in equipping his restaurant he bought two French-type knives for use in his kitchen. The defendant, employed as a dishwasher, had access to these knives. After November 16 or 17 one of the knives was missing. State's Exhibit No. 5 (the knife found in the manhole) is exactly the same style and the same shape. [121 S.E.2d at 849].

**24.** At the State Court trial Homberg testified that after the knife was found in the manhole he went to the police car (the same car in which Homberg, Porter and Outing had ridden, several hours before, to the verge of the wooded area) and that he (Homberg) "radioed headquarters to send an identification man out * * * ." Porter testified during the State Court trial that during the time Homberg "was gone to the car, George and I sat down on the ditch bank and George told me at that time that he had been paid three dollars by a man to put the knife in the manhole cover." It does not clearly appear from the transcripts of either the State Court trial or the hearing in the District Court how much time transpired between the discovery of the knife and Fesperman's arrival. Both Porter and Homberg testified in the State Court that the knife was found at four o'clock Saturday afternoon; when asked at the trial when he had arrived at the scene on Saturday afternoon Fesperman testified "I don't know but it must have been around 4:00 or 4:30, it was in the afternoon, when I got there." The Supreme Court of North Carolina stated that Fesperman was present when the knife was discovered, having joined Outing and the two detectives (Porter and Homberg) "shortly before the discovery of the knife." 121 S.E.2d at 848. This would not seem to be borne out by the testimony of Porter, Homberg, Outing and Fesperman himself, all of whom testified in the State Court (and the first three of whom testified in the District Court) that the knife had already been found when Fesperman arrived on the scene. Fesperman testified at the State Court trial that he looked down the manhole and "maybe five or ten minutes later I did shoot [the pistol shots referred to below in the text of this opinion] but not right looking in the hole and then shoot."

tified that as far as he could recall Fesperman had said nothing else. The photographer took some pictures.

At some point after his arrival, the exact time being unclear, Detective Fesperman fired one or two or two or three shots from his pistol in the presence of Outing. Porter testified that at the time the shots were fired he was standing with Outing and "we were directing the photographers on what photographs we wanted, and so on." Outing testified that he had backed away from the manhole and was standing alone. Porter testified that he was standing about eighteen feet from Fesperman when the shots were fired, that he was not "paying too much attention to what Mr. Fesperman was doing" and that prior to firing the shots Fesperman "made some comment about the ammunition in his gun being real old and he doubted if it would shoot." Homberg testified that he was standing five to eight feet from Fesperman, that he had no advance warning that the shots were going to be fired, that he heard "no comment at all," and that the shots startled him. Porter testified that the photographer had discarded some used flashbulbs. Porter further testified: "If I recall it correctly, I believe I heard Mr. Fesperman say that he had some ammunition in his revolver that was real old, or something to that effect, and that he didn't know if it would even fire or not; and then he fired at a light bulb which had been thrown up here where there were some small trees or a little wooded area." Porter testified that he had discussed the shooting with Fesperman "several times" afterwards and that the two of them "discussed it since we found out we had to come up here, as one officer would to another." Porter testified that "we talked about why he [Fesperman] had shot, and that's what he told me."[25] Outing testified that no one had mentioned anything to him about shooting before the shots were fired and that the first indication he had about the shooting was when the gun was fired. Porter testified that Fesperman had not addressed any remarks to Outing before he fired the pistol. Outing testified that the first time he noticed the pistol in Fesperman's hand was after it was fired.

* * * * *

[The officers admitted] that Detective Fesperman fired two shots from his service revolver while the investigation was under way and the prisoner was in the field with the officers. The defendant testified that the officer shot at him and within a few inches of his feet. This the officers denied. Fesperman himself testified: "After the fingerprint man had taken all of the pictures and thrown the bulbs up there in the woods, and, if I am not mistaken, we were getting ready to leave, the cover was back on (manhole) and I had some old ammunition and said I am going to try it * * * I a'int never talked to Outing * * * I don't recall seeing Outing after that." Other officers corroborated Fesperman that he was some distance from Outing and that he shot in the woods at a flashlight bulb. [121 S.E.2d at 849–50].

The North Carolina Supreme Court further stated:

The shooting by Fesperman was in violation of police regulations. It was highly improper, and, at best, a thoughtless blunder. [121 S.E.2d at 850].

---

25. When first questioned at the trial concerning any remark which Fesperman may have made when he pulled out his gun Porter testified "I just don't remember him [Fesperman] saying anything." At a later point in his testimony at the trial Porter stated that "the best I remember I was not paying any attention to what Mr. Fesperman said but I believe he said he had some old ammunition and there was a little bulb that was I guess 25 or 30 feet from where George Outing was standing in another direction, this little bulb was lying in a wooded area."

Although Fesperman testified in the trial court, he did not testify in the District Court below. The record does not disclose why he did not so testify. The testimony of the officers at the trial in regard to the shooting incident was summarized by the North Carolina Supreme Court as follows:

Upon cross-examination, officers admitted that Fesperman fired his revolver twice at a flashlight bulb some 30 feet away; that he was not near the defendant at the time, and that he made no threats but stated that he wanted to test some old ammunition and fired only two shots. [121 S.E.2d at 848].

Porter and Outing differ in their versions of the physical relationships of the persons present at the time of the shooting. Homberg agreed with Porter's version. Porter testified that there were some "trees or a little wooded area" about 18 feet above and to the right of the manhole and that the light bulbs were up in the wooded area and were "approximately 30 feet, maybe a little farther" from the manhole. Porter testified that he and Outing were standing together about three feet apart from one another to the left of the manhole. Porter testified that Fesperman was on the side of the manhole opposite from where he and Outing were standing and that Fesperman was standing about 18 feet away from himself. Porter testified that he didn't know where "the other people were" but that there were several people standing between Fesperman, on the one hand, and Outing and himself on the other hand. Porter recalled that he himself was standing between Fesperman and Outing. Outing testified that he was standing alone to the left of the manhole and that both Fesperman and Porter were standing to the right of the manhole. Outing testified that Fesperman was standing about nine feet away from himself. Outing testified that he did not know how far Porter and Fesperman were standing from each other but that Fesperman was closer to him (Outing) than was Porter. Outing testified that

he couldn't recall where Homberg was standing but that the photographer was standing further to the right of the manhole than Porter or Fesperman and that Porter or Homberg "was over there talking to the photographer * * *." Homberg testified that he was positioned at the manhole when the shots were fired.

Porter testified that "Mr. Fesperman shot in the direction of one of the bulbs." Outing testified that he "didn't see any flashbulbs," that he did not know where the first shot was fired, but that the second bullet hit the dirt "about six or seven inches from the place where I was standing at." [26]

Outing testified that "right after" Fesperman fired the shots he (Fesperman) said to him (Outing): "George, * * * if you don't confess to this crime, the same damn thing is going to happen to you." Outing testified that he didn't say anything in response. Porter testified that Fesperman did not address any remarks to Outing before he fired or at the time he was firing or after he fired. Porter testified that he did not hear anyone tell Outing that if he didn't go ahead and admit the killing of Hamilton the same thing would happen to him. Homberg testified that he could recall no conversation between Outing and Fesperman and that he (Homberg) "heard no comment at all." Porter testified that Outing was not threatened at all.[27]

26. The District Court found as facts the following:

After the weapon was found and had been photographed, Officer Fesperman fired his police pistol at some spent flashbulbs some 30'–40' from the manhole, outside the range of physical danger to petitioner. [District Court's Finding No. 8].

On the basis of Porter's testimony that he and Outing were standing about three feet from one another and that Fesperman was standing about 18 feet from himself (Porter), Porter's testimony would place Fesperman approximately 21 feet from Outing when the shot or shots were fired.

27. The District Court found as facts the following:

Neither Officer Fesperman nor any other officer told petitioner then or a any other time that petitioner would be shot or otherwise mistreated if he did not confess to the crime. [District Court's Finding No. 9].

The Supreme Court of North Carolina summarized Outing's testimony in this connection at the trial as follows:

"If I made a confession it was not to my knowledge. I don't know if I made one because I was all upset * * * I was afraid the man was going to kill me so they say I made a confession. * * * After Mr. Fesperman shot and promised to kill me I would admit anything. He said, 'This is the same damn thing that will happen to you if you don't confess to this.'

Porter testified that after Fesperman fired the shots he (Porter) and Outing walked to a little bank and sat down. Porter testified that "there was some conversation between Outing and I about his father who had just walked up here to where Celia and Rosetta [Streets], I believe it is, would have intersected had they gone far enough to join; and he called to my attention that his father was up there on the hill, and we walked up then and set down on this little bank while we waited for the photographer to finish." Porter testified: "That's when he [Outing] said he would like to get this mess over with or something to that effect, and he [Outing] said, 'I would like to talk with my wife and then tell you all about it.'" [When asked during the plenary proceeding in the District Court if he had told the detectives that he wanted to talk with his wife Outing testified: "Yeah, they got my wife down there."] Porter testified that this was the first time Outing said this and that he (Outing) said it "a matter of a few minutes" after the pistol shots. Porter testified that prior to finding the knife in the manhole Outing had denied killing Hamilton though he had been asked if he had done it. Homberg testified that Outing had not admitted any participation in the crime on Saturday. Porter testified that he could not recall Outing having made any remarks to him at the time of or following the shooting with respect to the firing of the pistol. Porter testified that there was no discussion be-

tween Outing and himself concerning the shooting, that he did not notice any effect on Outing as a result of the shooting, and that he could not recall whether Outing had jumped when the pistol went off. Porter testified that the shooting incident "seemed very insignificant to me at that time; I didn't have my mind on that at all."[28] Porter testified that they were out in the woods for approximately three or four hours. Shortly after Outing's statement to Porter, Outing was taken back to the station.

Porter testified that after they returned to the station "we got his wife down there and let them go into a little room by themselves * * *." Outing testified that he told his wife that they were trying to connect him with the crime and that she had said "Well, ain't nothing you can do about it." Outing thereupon escaped by jumping out of the window from the second floor of the detective bureau.[29] Homberg testified that this "was after it had gotten dark." Outing testified that he believed Fesperman would carry out his alleged threat and that he "jumped out the window that Saturday night because I was scared he [Fesperman] would kill me." Outing testified that he went to his wife's cousin's. Porter testified that prior to this time Outing had not attempted to escape. Porter and Homberg both testified that at the time of his escape Outing had not been informed that he was under arrest for the murder and that a warrant against him had not been signed.[30]

He shot several times about seven or eight inches from my feet. He was shooting at me * * * He pointed the gun at me and that time (Friday) [sic] I had not told anybody that I was implicated. It scared me because I never had been shot at before." [121 S.E.2d at 848–849].

28. Porter testified at the trial that Outing had denied that he had killed Hamilton "up until" the time Fesperman fired the shots. Porter further testified in the trial court that "I was interested in George Outing and not interested in any old ammunition so it did not make any difference to me whether he [Fesperman] fired the gun or not."

29. The District Court found as a fact that "Petitioner was returned to police headquarters after the knife was located, and he escaped through a window * * *." (District Court's Finding No. 10).

In the trial court Porter maintained that Outing had escaped because he and his wife had become engaged in an argument in the small room from which Outing escaped concerning his wife's support payments, an argument which Porter testified had angered Outing.

30. The District Court found that "at no time during Saturday was petitioner advised of his constitutional rights, nor was he intimidated, threatened, or coerced." (District Court's Finding No. 10).

*Sunday, November 20, 1960*

Porter testified that on Sunday morning Outing was picked up by police officers. Outing testified that he was picked up by detectives at his wife's cousin's and that either Homberg or Porter was among them. Porter testified that he did not know who the officers were. Outing testified that one of the detectives came into the house; told him "You're the man we're looking for"; handcuffed him; and carried him to the police station. Outing testified that the detectives did not have a warrant for him, did not read a warrant to him and did not at that time tell him that they were going to charge him with murder.

Homberg testified that he came to work around 6:30 Sunday morning and at that time was informed that a telephone call had been received as to Outing's whereabouts. Homberg testified that he went out with two patrolmen, who apprehended Outing, handcuffed him and brought him to the Detective Bureau. Porter testified that Outing was at the police station when he (Porter) saw him (Outing) Sunday morning and that "it was early, around 7 or 7:30."

Porter testified that he and Homberg interviewed Outing in a room at the Detective Bureau and that just the three of them were in the room. Porter testified that Outing confessed "after interrogating him for some time" but that "it wasn't very long" after he (Porter) had begun to engage him (Outing) in conversation that the confession came. Porter testified that "at first he [Outing] was real apologetic for escaping and said that he would like to get this whole thing cleared up." Porter testified that Outing was cooperative, "very much so," on this occasion and Homberg testified

that Outing was "very cooperative all the way along the line * * *."

Outing testified that he was taken to one of the detective's offices in the jail and that "they started questioning me about the crime, and I was in the room with these men, the detectives." Outing testified that there were four or five detectives in the room but that he could only identify Porter or Homberg as being among them. Outing testified that "they wanted me to tell them that I committed this crime." Outing testified that "they told me, say, 'George, we know that you committed this crime. You just go ahead and tell us that you did it.'" Outing testified that he denied doing it. Outing testified that the officers struck him in the face and stomach with their fists and hands but that the beating did not leave marks or break the skin and that he did not bleed. Outing testified that he did not know how many times he was struck, that he did not recall who had struck him, but that "it was more than one," that one of them had civilian clothes on and that Porter was there at the time. Outing said that he was told he was being beaten "because I knowed something about the crime, and they wanted me to go ahead and tell them that I committed the crime." Outing testified that he confessed because of the beating and because "I was afraid Mr. Fesperman would probably kill me if I didn't." Outing testified that he said he committed the crime "because I had no other alternative" and "he told me to say it, and I was scared, and I did."

Porter testified that he did not strike Outing and that "he was not mistreated in any way." Homberg testified that Outing was "never struck in my presence or in Mr. Porter's presence to my knowledge." [31]

---

31. The respective testimony of Outing and the officers with regard to the alleged beatings was as different at the trial as it was during the hearing in the District Court below. The District Court found as a fact that "before making the statement * * * petitioner [was not] mistreated, threatened, intimidated or coerced." (District Court's Finding No.

11). The District Court made the further finding that "At the time petitioner made the confession, he was 18 years of age, married, a former police informant, and an employee of a restaurant." (District Court's Finding No. 12). The records in the trial court and District Court below do not indicate the nature or extent of any prior activities by Outing in

Porter testified that Outing confessed to Homberg and himself together and told them everything about the whole thing "from stem to stern." Outing also testified that he made an oral confession in the presence of Porter and Homberg.[32] Porter testified that this was the first time Outing admitting the killing. Porter testified that Outing made an oral confession first and that the statement that Outing gave was then typed by Dixon or Dixon's secretary. Porter testified that the typed statement was read to Outing and that Outing was requested to sign it but that Outing said he did not wish to sign it and did not sign it.[33] Outing testified

connection with being an "informant." The North Carolina Supreme Court summarized the testimony at the trial as to Outing's confession, recounted by Porter during the hearing out of the jury's presence and by Homberg before the jury, as follows:

After his re-arrest at the house of a relative in Charlotte on Sunday morning, he confessed, telling in substance the following story: He had been working as a dishwasher in a restaurant at the Dobbs House; that he left work about 11:30 p. m. on Wednesday, November 16. He picked up a long kitchen knife, concealed it in his coat, intending to use it in breaking open a vending machine. However, on his way home a Yellow Cab passed. He called to the driver, got in the back seat as a passenger and gave the driver an address, and when the driver got to the address and stopped, he reached over from behind, put the knife close to the taxi driver's face, and said, "I will take your money." Mr. Hamilton said, "Oh, no you won't," and grabbed the knife. They scuffled over the knife. "Mr. Hamilton was an older man and weaker, and he gave in first and he let his grip slip and the knife plunged into his chest." He stated he didn't know how many times he stabbed or struck or hit Mr. Hamilton; that to the best of his remembrance he said it was four or five times; that he drove the cab to where it was found, took the wallet, change purse and a billfold with some change which he got out of Mr. Hamilton's pocket. Thereafter he pushed Mr. Hamilton over under the wheel of the cab, left, took the money out of the purse, hid the knife in the manhole, and went home. That on Sunday night after the defendant's re-arrest that morning, his father came to the jail and defendant said to his father, "I did it." [121 S.E.2d at 848].

32. In the trial court Porter testified that Outing "confessed to us on Sunday morning soon after he was brought in * * * as soon as he was apprehended Sunday morning he came in and apologized to Mr. Homberg and I and told us that he was sorry, that he was ready to get the whole thing off his chest." Homberg testified at the trial that there then ensued a five or six hour period during which "we rehashed it, went over and over it and over it to make sure that George was not lying to us." The North Carolina Supreme Court stated:

No doubt the officers confronted the defendant with the many inconsistencies and contradictions in his story and the suspicion attached to his claim to have seen so many different people near the scene—one with a long knife—at such an hour. When caught in a web of his own weaving he apparently thereafter confessed. [121 S.E.2d at 850].

33. In the trial court both Porter and Homberg testified that they did not ask Outing to sign any statement or confession. Both testified at that time that it was not "a policy" to have written confessions signed. Both Porter and Homberg testified that they took personal notes of Outing's statement to refresh their recollections. During the trial Homberg did not produce the notes taken by him, although he testified that the notes were in his locker. Porter, on the other hand, produced his personal notes of the oral confession, which were on the back of an envelope, and recounted Outing's confession using those notes to refresh his recollection. Porter further testified that Detective Dixon was requested to type a summary of the confession. Both Porter and Homberg testified that they did not know where the typed summary was. No such "summary" was produced throughout the proceedings in the trial court, although Outing's counsel asked Porter to get it. When this request was made the trial judge, addressing Outing's counsel, stated: "Now Mr. Bell, lets get down to brass tacks, it has come to my attention since you are digging into this that you have got an order from Judge Clarkson to examine every paper in this case that was pertinent and you did so. Now you are not now and you will never be entitled to go into the police records to get their work sheets, that is not a part of the evidence or part of this case. Now don't try to kid me, lets get down to what this is." Outing's counsel asked Porter during the trial whether

that he was not shown a piece of paper after the oral confession and that a statement was never read to him.

The District Court found that *"petitioner was advised before making the statement * * * that any statement he made could be used for or against him * * *."* (District Court's Finding No. 11) (emphasis supplied). Outing testified that he was never informed that anything he said could be used against him. Porter's complete testimony relative to such advice was as follows:

Q. Was he advised that anything he said might be used against him in a criminal action?

A. He was, sir.

Q. Who advised him of that?

A. I don't recall.

Q. Do you recall whether or not it was you?

A. No, sir, I do not.

Q. And you say you and Mr. —— who was present at that time?

A. Mr. Homberg and I.

Q. Do you recall the words that were used?

A. No, sir. I have it in the statement if you would like for me to read it.

Q. All right, sir, would you relate back to that, please, sir.

A. (Reading) 'In the alleged robbery and killing of James Tyree Hamilton, white male, 413½ State Street, Charlotte, North Carolina, at approximately 1 A.M., November 17, 1960, I make this statement of my own free will and accord, without any promises or threats, knowing that my statement can be used for or against me in court * * *.'

Q. Now, what are you referring to there, please, sir?

A. This is the statement that was typed, the statement that he gave us.

Q. Did he sign it?

A. No, sir.

Q. He did not sign it?

A. No, sir.

Q. Was he requested to sign it?

A. We asked him to sign it if he wished to do so.

Q. Do you know whether or not he read it?

A. Yes, sir, it was read to him.

Q. Now, that statement was typed after he made the confession?

A. He made the oral confession first. The statement was typed by Mr. Dixon or maybe his secretary.

Q. Now, the part about him saying in the typed statement which he did not sign that he knew that anything he said might be used against him, that part was typed after he made the confession, was it not?

A. He was told that.

Q. All right, sir. But you say you don't recall who did tell him?

A. No, sir.

* * * * * * *

Q. And do you recall that he was advised he didn't have to make a statement if he didn't want to?

A. That is correct.

Q. You advised him it could be used against him later on?

A. Yes, sir, for him or against him either one.

Homberg's complete testimony relative to such advice was as follows:

Q. Were you present when he gave the confession to Mr. Porter?

A. Yes, sir.

Q. Do you recall whether anyone advised him whether or not he did not have to say anything if he did not want to?

A. I don't recall whether it was Mr. Porter or myself who instructed

or not Porter had shown him (Outing's counsel) the summary when he (counsel) had gone to the detective division and asked for all of the papers in connection with

the case, but the question was objected to and the objection sustained. All evidence in the trial in connection with Outing's confession was testimonial.

George that if he said anything it could be held against him or used for him in a court of justice.

Q. Now, was that before he made the statement?

A. Yes, sir.

Q. When was the first time you heard anyone tell him that?

A. Make that statement I just made?

Q. Yes, sir. When was the first time that he was told that in your presence—what day?

A. This was Sunday morning.

Q. Had you heard anyone else tell him that prior to that time?

A. That if he hold us anything, it could be used for or against him?

Q. Yes, sir.

A. I hadn't heard him, no sir.

Q. You are speaking of Sunday morning, November 20, 1960?

A. That's right.

The District Court found that *"petitioner was advised before making the statement that he did not have to make a statement * * *."* (District Court's Finding No. 11) (emphasis supplied). Outing testified that he was never informed that he did not have to say anything. The complete testimony, given by Porter, relative to the giving of such advice was as follows:

Q. And did you tell him at that time [Friday] or at any time that he did not have to say anything that he did not wish to say to you regarding the investigation?

A. Not at that time, no sir.

Q. When did you ever tell him that, sir?

A. On the day we took the statement.

Q. What day was that?

A. That was on Sunday.

Q. That was on Sunday?

A. Sunday morning, yes, sir.

* * * * *

Q. And before the statement was taken, do you recall whether it was you or Officer Homberg that advised him that he didn't have to make a statement?

A. I don't recall.

Q. It was just the two of you and the defendant in the room?

A. Yes, sir.

Q. It was one or the other of you?

A. Yes, sir.

Q. And you do recall that he was advised he didn't have to make a statement if he didn't want to?

A. That is correct.

Porter testified that Outing was not advised about his right to consult an attorney. Outing testified that he was not advised that he had a right to counsel. The transcript contains no testimony from Homberg relative to the giving or absence of such advice. The District Court found that "petitioner * * * was not advised that he had a right to counsel * * *." (District Court's Finding No. 11).

Porter testified that on Sunday after Outing "had confessed and given us a statement" he was questioned about the unsolved murder of a Mr. C. D. Campbell. Porter testified that: "He [Outing] was not interrogated. We simply asked him if he had any information that would prove valuable to us in solving the case." Porter testified that Outing was not told that he would be charged with the murder of Campbell if he did not confess to Hamilton's murder. Porter testified that Outing "was not asked about that one [the Campbell murder]," that "we were simply seeking information," and that Outing "told us how he thought it was committed."

Outing testified that he was told that his father was coming to the station and that about an hour after the confession his father came down to the station. Outing testified that "they wanted me to tell my father that I committed that crime or they were going to let Mr. Fesperman carry out that what he said he was going to do to me." Outing testified

that he told his father that he did it.[34] Outing testified that Detective J. W. Severs was in the room when he said this to his father. Severs testified that he heard Outing's father say, "What about it, Son?" and that Outing said "I did it, Dad." Severs testified that both he and Homberg were with Outing and his father at the time. Homberg also testified that Outing told his father that he had committed the crime.

Porter testified that at an undetermined time after Outing confessed on Sunday, he (Porter) took Outing back to the wooded area they had previously visited on Friday and Saturday.

### Subsequent to Sunday, November 20, 1960

John York, a reporter for the Charlotte Observer, testified during the hearing in the District Court, that he had been a reporter for the same newspaper in 1960 and that he had covered the Outing case for his newspaper "from the beginning." York testified that at some time "just prior" to Outing's trial he (York) had gone to talk with Outing in jail. York testified that at the time of his visit to the jail Outing was represented by counsel and that he (York) had known that Outing was so represented and that he (York) knew the identity of Outing's counsel, who was Mr. Charles Bell. York testified that he could not "specifically remember asking Mr. Bell to allow me to talk to Outing * * *." York testified that he thought he had asked Bell if he (York) could talk with Outing, "and Mr. Bell had said something like, 'Well we'll see.'" York testified that Bell had told him that Outing claimed he had been beaten and that he (York) then went to Chief James, Chief of Police in Charlotte, who told him that Outing's statement was untrue. York testified that he believed Chief James had suggested that he (York) talk with Outing about the story of the beating. York testified that he then went to Solicitor Downs and asked him if he could talk with Outing. York testified that Downs "sent me up to the jail along with an assistant, Mr. Robinson, and Mr. Robinson was with me when I talked with Outing." York testified that Outing had told him and Robinson about the beating and that Outing told them that Porter and Homberg were not the officers who had beaten him. York testified that he "decided in my own mind there wasn't much to it."[35]

34. The Supreme Court of North Carolina stated:

> On cross-examination, the defendant admitted he told his father in police headquarters, "I did it," but he did not mean to confess the killing of Mr. Hamilton. [121 S.E.2d at 849].

35. Solicitor Downs and Assistant Solicitor Robinson appeared for the prosecution at Outing's trial. At the trial and out of the presence of the jury York testified that he did not believe he had told Bell, who represented Outing at the trial, that he (York) wanted to see Outing in jail or that he wanted to talk to Outing. York testified that he had requested permission from Downs to talk with Outing and that such permission had been granted. York testified that Robinson had accompanied him to see Outing. Robinson testified at the trial (and out of the hearing of the jury) that he had accompanied York at Downs' request and that he "merely went along to see what Mr. York was going to do, to see that we did not reveal the full details of the case" and to protect the State's case. Robinson testified that he knew at the time that Outing was represented by Bell. Robinson testified that he himself did not question Outing on this occasion but that he heard York's questioning of Outing. The questioning of Outing by York in the presence of Assistant Solicitor Robinson without the knowledge or consent of Outing's counsel is worthy of some consideration in deciding the issue of whether Outing's confession was "voluntarily given or [was] the result of overbearing by police authorities." Davis v. State of North Carolina, supra, 384 U.S. at 739, 86 S.Ct. at 1763. While this incident may be said to be "not germane to the present problem because [it] happened after the confession was made", Haley v. Ohio, 332 U.S. 596, 600, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948), it is an additional illumination, among many, of the standards and practices applied in this case by the authorities. The visit paid Outing in jail by York and Robinson, at the behest of Solicitor Downs, is an incident of a type which inherently poses danger of unfair prejudice to a defendant's

## The Standard of Review

Upon the basis of all of the above testimony the District Court made findings with regard to the historical occurrences and events surrounding the confession. Such findings are conclusive "unless clearly erroneous." Fed.R.Civ. P. 52(a). Establishment of historical facts is, however, but the first of three stages in the determination of whether or not a confession was "voluntary" in the legal sense. As Mr. Justice Frankfurter wrote in his opinion in Culombe v. Connecticut, supra, 367 U.S. at 603, 81 S.Ct. at 1879.[36]

> The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession. Second, because the concept of 'voluntariness' is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, 'psychological' fact. Third, there is

the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances.

It is apparent that the second and third of these stages—the determination of psychological facts and application thereto of legal standards—"become in practical operation inextricably interwoven." 367 U.S. at 604, 81 S.Ct. at 1880. It is also apparent that insofar as appellate review of a lower court's determination is concerned with those latter two stages, the "clearly erroneous" standard of review is not applicable. See id. at 605–606, 81 S.Ct. 1860. Decisions at those two stages "depend very little on the credibility of witnesses, which usually is critical for 'crude historical facts,' and precedents confirm that an appellate court has considerable responsibility to form its own judgment whether a record in a particular case suffices to bespeak coercion." Collins v. Beto, supra, 348 F.2d at 832 (Friendly, J., concurring).

case since the defendant, without benefit of advice of his counsel, may advertently or inadvertently reveal aspects of the defense which his counsel plans to offer at trial. For example, in the present case Outing testified at trial, both during the hearing out of the presence of the jury and also in the presence of the jury, that Porter and Homberg had been among the officers who had beaten him on Sunday morning. Both York and Robinson testified at the trial out of the jury's hearing that Outing had told them when they visited him in jail that neither Porter nor Homberg had been among the officers who had beaten him. Neither York nor Robinson testified in the trial court before the jury, so their testimony in this regard could not be said to have directly affected the ultimate verdict. But their testimony was before the trial judge when he came to rule upon the voluntariness and admissibility of the confession before return of the jury, and Solicitor Downs, in arguing that the confession was voluntary, pointed to the discrepancies between Outing's testimony and the testimony of York and Robinson in regard to who had allegedly beaten Outing.

36. Mr. Justice Frankfurter's opinion in *Culombe* has been characterized as "the most ambitious attempt to bring order, coherence and clarity to the 'involuntary' or 'coerced' confession field * * *." Y. Kamisar, A Dissent from the Miranda Dissents, supra, 65 Mich.L.Rev. at 98. See also the opinion of Mr. Justice Frankfurter in Watts v. State of Indiana, 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (1949), wherein he wrote: "But 'issue of fact' is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication. * * * Especially in cases arising under the Due Process Clause is it important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits."

While no single fact or factor which occurred during, or is related to, the four days in November 1960, in and of itself requires a determination that the record cannot support a finding that Outing's confession was voluntarily given, I am persuaded that in a number of significant ways the circumstances in this case add up to a totality of coercion.

### The Advice Given Outing in Regard to his Constitutional Rights

The District Court below found as a fact that Outing was not advised as to any of his constitutional rights until Sunday morning. The District Court further found that on Sunday morning "petitioner was advised before making the statement that he did not have to make a statement, that any statement he made could be used for or against him, but he was not advised that he had a right to counsel * * *." Prior to its decision in Escobedo v. State of Illinois,[37] the United States Supreme Court had given clear indication that in determining the voluntariness of a confession it is appropriate to consider a failure on the part of the police to advise an accused that his statement may be used against him,[38] that he has the right to remain silent,[39] the right to secure a lawyer,[40] and the right to request or have a preliminary hearing.[41] The absence of such advice or warnings was not conclusive of the issue of voluntariness under pre-*Esbodedo* and pre-*Miranda* law,

but such factors were "unquestionably attendant circumstances which the accused is entitled to have appropriately considered in determining voluntariness and admissibility of his confession." Haynes v. State of Washington, 373 U.S. 503, 517, 83 S.Ct. 1336, 1345 (1963). More recently the Supreme Court, while denying retroactive application of *Escobedo* and *Miranda*,[42] has stated in regard to cases which are governed by neither of those decisions that the fact "that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda*, is a significant factor in considering the voluntariness of statements later made." Davis v. State of North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764 (1966). In Clewis v. State of Texas, supra, 386 U.S. at 709, 87 S.Ct. at 1340, among the three factors which the Supreme Court considered in reaching the conclusion that the confession in that case was not voluntary was the fact that "petitioner was never fully advised that he could consult counsel and have counsel appointed if necessary, that he was entitled to remain silent, and that anything he said could be used as evidence against him."

The record as to precisely when Outing was advised concerning his right to silence and as to precisely when Outing was warned that any statement he might make could be used for or against him is

37. 378 U.S. 478, 84 S.Ct. 1758 (1964).

38. Haynes v. State of Washington, supra, 373 U.S. at 510–511, 516–517, 83 S.Ct. 1336.

39. Culombe v. Connecticut, supra, 367 U.S. at 631–632, 81 S.Ct. 1860; Haynes v. State of Washington, supra, 373 U.S. at 510–511, 516–517, 83 S.Ct. 1336; Turner v. Com. of Pennsylvania, 338 U.S. 62, 64, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); Harris v. State of South Carolina, 338 U.S. 68, 70–71, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949). "The privilege against self-incrimination is, of course, related to question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not the mere fruits of fear or coercion, but are reliable expressions of the truth. * * *

One of its purposes is to prevent the State, whether by force or by psychological domination, from overcoming the mind and will of the person under investigation and depriving him of the freedom to decide whether to assist the State in securing his conviction." In re Gault, supra, 387 U.S. at 47, 87 S.Ct. at 1454.

40. Haynes v. State of Washington, supra, 373 U.S. at 510–511, 516–517, 83 S.Ct. 1336; Harris v. State of South Carolina, supra.

41. Haynes v. State of Washington, supra, 373 U.S. at 510–511, 516–517, 83 S.Ct. 1336; Harris v. State of South Carolina, supra.

42. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

hopelessly confused. The District Court found that such advice was given "before making the statement * * *." Outing made both oral and written confessions on Sunday morning. Porter, when asked during the hearing in the District Court whether or not he recalled the words that had been used in advising Outing, testified that he had the words in a typed statement. At no point in his testimony did Porter specifically state that Outing had been advised in regard to any of his constitutional rights prior to the oral confession.[43] Homberg's testimony is similarly unclear. The closest Homberg came to stating exactly when Outing was advised of any rights was in his affirmative response to a question concerning whether or not Outing had been advised "before he made the statement" that if he said anything it could be used against him in a court of law. It is completely unclear whether Homberg's reference in this answer was to Outing's oral confession or to the typed statement displayed by Porter.

There is a complete absence in the State Court hearing of mention by either Porter or Homberg (or any other officer) that any advice concerning these rights was given to Outing.[44] Further, in the District Court hearing neither Porter nor Homberg could recall which of the two of them had given the advice. Also in the District Court proceeding Porter testified that the typed statement was read to Outing and that Outing was requested to sign it but refused to do so. During the State Court trial Porter denied ever having read any statement to Outing or ever having requested Outing to sign such a statement, and testified that it was not "a policy" to have such statements signed. In the State Court both Porter and Homberg testified that a typed statement had been prepared, but neither knew where the statement was and there was no testimony as to when the statement was typed. In the District Court Porter testified that the typed statement had been prepared by Detective Dixon (or Dixon's secretary) after Outing had made the oral confession. Porter (at the trial) gave a detailed account of Outing's confession using notes which he said he had taken on the back of an envelope during Outing's confession and which, presumably, were the notes upon which the type statement was based. In testifying from those notes in the State Court, Porter made no reference to Outing's having been advised of any rights whatever. The precise time at which advice, if any, as to constitutional rights was interjected

---

43. See the facts set out in the body of this opinion at pp. 911–913 supra. The nearest Porter ever came to pinpointing the time at which the advice was given occurred in the following exchange in the District Court on direct examination :

 Q. Now, the part about him saying in the typed statement which he did not sign that he knew anything he said might be used against him, that part was typed after he made the confession, was it not?

 A. He was told that.

44. The only testimony in the trial court concerning Outing's ever having been advised of any rights whatsoever was the testimony of Porter that Outing was advised that "he could call a lawyer or his minister, his mother or anybody else" and also that Outing had been advised of his right to have or to waive a preliminary hearing (which relates to events after the confession and subsequent to Sunday, November 20, 1960).

At the State Court trial testimony was given by the police officers concerning several exculpatory statements which they testified Outing had made to them prior to the discovery of the knife on Saturday afternoon. Most notable in this connection perhaps was the testimony of Porter and Homberg that Outing had told them as early as Friday that he knew where the knife was and that on Saturday Outing stated that someone had paid him to hide the knife. In United States v. Slaughter, 366 F.2d 833 (4th Cir. 1966), a case decided under *Escobedo* though not under *Miranda,* this Court discussed in detail the right of an accused to counsel in the pre-indictment period and indicated its disapproval of the use of exculpatory statements of the accused made by him at a time when "there is nothing to indicate that he understood or appreciated that false or conflicting exculpatory statements could be used to establish his guilt." 366 F.2d at 840.

into the interrogation process is certainly not unimportant. The Supreme Court has emphasized this factor in those cases which are directly controlled by *Escobedo* or *Miranda* by requiring that the advice spoken of in those cases be given, "prior to any questioning," after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda v. State of Arizona, supra, 384 U.S. at 444, 86 S.Ct. 1602. Under pre-*Miranda* and pre-*Escobedo* standards, it has been said that when an accused was not advised of his constitutional rights until after his interrogators had prepared a typed summary of his oral confession, such "advice" can hardly be plausibly advanced to support a finding that the confession was voluntary. See Collins v. Beto, supra, 348 F.2d at 825, 828 (opinion of Tuttle, C. J.); id. at 834 (Friendly, J., concurring).[45]

The record in the present case clearly raises doubts as to whether or not Outing was advised of any constitutional rights prior to the oral confession Sunday morning. Yet even resolving those doubts in favor of the State and assuming that Outing was advised in the manner testified to by Porter and Homberg at some point during the interrogation Sunday morning prior to the moment at which he actually confessed, it is difficult to accord much weight to such advice given on Sunday—and admittedly not during the prior days in which Outing was in police custody and interrogation commenced and continued. See Turner v. Com. of Pennsylvania, 338 U.S. 62, 64, 69 S.Ct. 1352 (1949). By Sunday morning, Outing had been subject to interrogation since Friday, had on Saturday afternoon indicated his readiness to confess, and had by his escape Saturday evening irretrievably implicated himself.

### The Detention

The illegality of Outing's arrest and detention on Friday and Saturday in

violation both of his constitutional rights and of North Carolina statutes is an appropriate consideration in testing a confession to determine whether it was the product of unconstrained choice. Clewis v. State of Texas, supra, 386 U.S. at 710, 87 S.Ct. at 1341. This Court has held that "[t]o constitute an arrest there must be an actual or constructive seizure or detention of the person, performed with intention to effect an arrest, so understood by the person detained, and the restraint must be under real or pretended legal authority." United States v. Comi, 336 F.2d 856, 858 (4th Cir. 1964). Similarly, the North Carolina Supreme Court has stated that "[a]n arrest consists in taking custody of another person under real or assumed authority, for the purpose of detaining him to answer a criminal charge or civil demand", and also that "[t]he application of actual force or visible physical restraint is not essential." Stancill v. Underwood, 188 N.C. 475, 124 S.E. 845, 846–847 (1924). Under either of these definitions it is apparent that Outing was effectively arrested on Friday. Allen testified that the "arrest sheet" would show at what time Outing was picked up on Friday morning. Porter testified in the trial court that Outing had been placed under arrest on Friday. Porter testified in the District Court that an arrest sheet had already been made with regard to Outing prior to the time he and Homberg locked Outing up on Friday night. There is thus no reason to doubt that Outing's captors considered him to be under arrest. Nor does there appear to be any reason to doubt that Outing was in fact under restraint. Outing's understanding must certainly have been that he was under arrest when, if not before, he was locked up Friday night and told (according to Porter) that he was "being held for investigation of this robbery and murder."

---

45. A similar problem in connection with the *Davis* case is alluded to by Professor Kamisar. Y. Kamisar, A Dissent from the Miranda Dissents, supra, 65 Mich.L. Rev. at 101. See Davis v. State of North Carolina, supra, 384 U.S. at 739, 86 S.Ct. 1761.

Outing's arrest took place without issuance or service of a warrant. Porter testified categorically that no warrant had been served on Outing through Saturday and Homberg testified that to his knowledge no warrant was sworn until after Outing's escape on Saturday and none was served until after the confession on Sunday. An arrest is lawful, absent a warrant, only if the arresting officer has probable cause to believe that the suspect committed a crime. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). This rule is applicable to arrest by State as well as by federal officers. Ker v. State of California, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1961); Collins v. Beto, supra, 348 F.2d at 826–827 (opinion of Tuttle, C. J.). Any arrest made without a warrant and in the absence of probable cause is violative of rights secured by the Fourth Amendment to the Constitution of the United States. Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).[46]

The majority opinion states that there was no probable cause to arrest Outing or to charge him with any crime at the time of his detention on Friday night. According to the testimony of the detectives, there were three possible indications that Outing was involved in the crime: (1) The information which Allen had received over the telephone from an unnamed informer who told him that Outing knew where the knife was; (2) Outing's apparent admission that he had been paid to hide the knife; and (3) The inconsistencies and contradictions concerning Outing's versions of whom he had seen on the night of the murder. Suspicion on the part of the officers that Outing was in some manner involved in the crime or knew something about the commission of the crime probably did not,

under the circumstances, constitute "probable cause." See Cervantes v. United States, 263 F.2d 800 (9th Cir. 1959). It perhaps is arguable whether any of the above items of information served to link Outing directly to the crime.[47] Both Homberg and Porter in their testimony in the District Court, when asked if they thought Outing had committed the crime, stated on each occasion that they thought Outing was involved or that he knew more about it than he was telling them. However, from their testimony it appears that at no point prior to Saturday afternoon were either of them willing to state that Outing had committed the crime. In regard to Outing's having been locked up on Friday night Homberg testified that he "would have to say that he [Outing] was being held as more of a material witness than he was a person that was to be charged with the crime."

Accepting the majority opinion's conclusion that Outing's arrest was illegal, the question arises as to what effect that determination has upon his confession. In Wong Sun v. United States, supra, the United States Supreme Court held that incriminating statements made following an illegal arrest are inadmissible as violative of the Fourth Amendment. The Supreme Court has not as yet, however, expressed an opinion on the question of whether or not the *Wong Sun* rule is applicable to state trials. See Clewis v. State of Texas, supra, 386 U.S. at 711, 87 S.Ct. at 1341 n. 7, in which the answer to that question was explicitly reserved by the Supreme Court. Strict application of the *Wong Sun* rule would involve an equation of verbal and real evidence and it has been argued that since real evidence seized in violation of the Fourth Amendment is excludable from state

---

**46.** Absent cause to believe that Outing would escape on Friday, a factor which does not appear from the record in this case, Outing's arrest would also violate North Carolina statutory law. That law provides: "A peace officer may without warrant arrest a person: \* \* \* (2)

When the officer has reasonable ground to believe that the person to be arrested has committed a felony and will evade arrest if not immediately taken into custody." 1C N.C.Gen.Stats. § 15–41 (1965 Cum. Supp.).

**47.** See note 20 supra.

trials [48] verbal evidence is similarly excludable. Collins v. Beto, supra, 348 F.2d at 826 (opinion of Tuttle, C. J.). It has, however, been noted that while the connection between a seizure of physical evidence in violation of the Constitution and the introduction of that evidence at a trial "is so automatic and inevitable that the latter is readily seen as the 'fruit' of the unconstitutional act", a statement taken subsequent to an illegal arrest is not necessarily a fruit of the unconstitutional intrusion since "there intervenes the individual's own decision to speak." Collins v. Beto, supra, 348 F.2d at 835 (Friendly, J., concurring). This Court has not as yet found it necessary to reach the question of the applicability of *Wong Sun* to state trials. See Jacobs v. Warden, 367 F.2d 321, 323 n. 2 (4th Cir. 1966); Ralph v. Pepersack, 335 F.2d 128, 136 & n. 11 (4th Cir. 1964). Nor need that question be reached in the instant case. In the *Collins* case Judge Friendly, while declining to reach a resolution of the claims relating to *Wong Sun* (348 F.2d at 834), found violations by the police to be factors to consider in determining the voluntariness of a confession and stated:

The law relating to arrest and detention does not always provide bright lines, and minor errors by the police are hardly to be avoided. But when the police operate in calculated and substantial disregard of the applicable rules, they cannot expect the benefit of any doubts as to undue pressure in a truly close case. [348 F.2d at 834].

Whether or not Outing's arrest was legal or illegal, the appropriateness of Judge Friendly's comment and the applicability thereof to the facts of the present case is reinforced by the fact that subsequent to Outing's arrest the officers violated two State statutory provisions relative to procedure on arrest without a warrant. The first of these provides:

Every person arrested without a warrant shall be either immediately taken before some magistrate having jurisdiction to issue a warrant in the case, or else committed to the county prison, and, as soon as may be, taken before such magistrate, who, on proper proof, shall issue a warrant and thereon proceed to act as may be required by law [1C N.C.Gen.Stats. § 15–46 (1953)].

It is clear from the record in both the State and District courts that Outing was not taken before a magistate through Sunday. It is also clear from the record in the State Court that Outing was incarcerated in the Charlotte City jail through Sunday and was not transferred to the county jail until some undetermined time thereafter. The second of these State provisions is as follows:

Upon the arrest, detention, or deprivation of the liberties of any person by an officer in this State, with or without warrant, it shall be the duty of the officer making the arrest to immediately inform the person arrested of the charge against him, and it shall further be the duty of the officer making said arrest, except in capital cases, to have bail fixed in a reasonable sum, and the person so arrested shall be permitted to give bail bond; and it shall be the duty of the officer making the arrest to permit the person so arrested to communicate with counsel and friends immediately, and the right of such persons to communicate with counsel and friends shall not be denied. Provided that in no event shall the prisoner be kept in custody for a longer period than twelve hours without a warrant.

Any officer who shall violate the provisions of this section shall be guilty of a misdemeanor and shall be fined or imprisoned, or both, in the discretion of the court. [1C N.C.Gen.Stats. § 15–47 (1965 Cum.Supp.)].

Only one of the several requirements of this statute—the provision relating to permitting the prisoner to communicate with counsel and friends—appears to have been complied with in this case.

---

48. Mapp v. Ohio, 367 U.S. 643, 31 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

The record discloses that Outing was informed of no charges against him—indeed there appeared to have been none—until Sunday morning. Further, Outing was kept in custody without a warrant for longer than twelve hours.

Where there has been unreasonable delay in bringing a prisoner before a magistrate, the federal rule which automatically excludes subsequent confessions has not been held to apply to criminal prosecutions in the state courts. See, e. g., United States v. Schwartz, 372 F.2d 678, 682 (4th Cir. 1967); Davis v. State of North Carolina, 339 F.2d 770, 777 (4th Cir. 1964), rev'd on other grounds, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The North Carolina Supreme Court has stated in regard to both of the statutory provisions quoted above that "[w]hile there are circumstances under which a failure to observe the foregoing provisions may not affect constitutional rights, yet where an offense as serious as robbery with firearms is charged, such failure must be given great weight in a hearing under the Post Conviction Hearing Act." State v. Graves, 251 N.C. 550, 112 S.E.2d 85, 91 (1960). That same Court has also held, however, that neither of those provisions prescribes mandatory procedures affecting the validity of a trial. State v. Hargett, 255 N.C. 412, 121 S.E.2d 589 (1961). Nevertheless, the flagrant violations of North Carolina's statutory provisions by the Charlotte detectives is but one more factor to consider in determining whether the record supports a finding that Outing's confession was voluntary. See

Clewis v. State of Texas, supra, 386 U. S. at 711, 87 S.Ct. at 1341; Davis v. State of North Carolina, supra, 339 F.2d at 777.

### Visits to Scene of Crime and Firing of Shots

Against the background of police irregularities and illegalities detailed above, the events of Friday night, Saturday, and the confession on Sunday morning come sharply into focus.

Having been interrogated in custody since early Friday morning, Outing was taken at approximately nine o'clock Friday night to a wooded area near the scene of the crime. Outing's uncontradicted testimony was that he was handcuffed at the time, testimony to which we may give credence on this appeal.[49] At this time Outing had been interrogated during a period of approximately twelve hours, had apparently been asked to take a lie-detector test,[50] had not been informed of his right to counsel, had not been informed of his right to remain silent, had not been informed that anything which he said could be used against him, had not been served with an arrest warrant, had not been told that he was under arrest, had not been informed of the charges against him, had not been taken before a magistrate or informed of his right to be taken before a magistrate, had not been informed of any right to make a telephone call or to contact anyone, and was not at the time informed by the officers that he was under no compulsion to accompany them to the wooded area.[51]

**49.** Outing consistently maintained that he was handcuffed during the trip to the woods on Friday night. Porter, when asked whether or not the detectives had been handcuffing Outing wherever they had been carrying him, said that he didn't recall if they had handcuffed Outing before Saturday. Outing's testimony in this regard would thus appear to be evidence which "fairly read in the context of the record as a whole, remains uncontradicted" and may be considered on appeal. See Culombe v. Connecticut, supra, 367 U.S. at 604, 81 S.Ct. 1860 (opinion of Frankfurter, J., joined by Mr. Justice Stewart).

**50.** See note 14 supra.

**51.** See White v. State of Texas, 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940), where petitioner's confession was held involuntary in a capital case largely on the ground that on several successive nights he was taken out of jail and interrogated in a wooded area, even though the confession itself was given in a jail building. See also Davis v. State of North Carolina, supra, 384 U.S. at 749–750, 86 S.Ct. at 1768, where Charlotte police officers "carried out a ruse to attempt to get Davis [the petitioner] to incriminate himself

On Saturday afternoon, when Outing was taken back to the woods, he had not yet been informed of any of his constitutional rights. Additionally, he had not been served with an arrest warrant, he had not been told that he was under arrest, he had not been informed of the charges against him, he had not been informed of his right to be taken before a magistrate, he had not been taken before a magistrate, and he had not been informed that he did not have to accompany the officers to the woods. Before Saturday afternoon he had been informed that he had a right to make a telephone call (including "his family, a minister, or a lawyer"). He had also spent the previous night in jail without being informed as to why he was being held except for Porter's statement that he was being held for "investigation of this robbery and murder." Outing had not seen anyone other than his interrogators between Friday morning and Saturday afternoon though the jailer had been instructed in his presence that he was to be allowed to see anyone he wished. It was under these circumstances that Outing was taken back to the wooded area at the scene of the crime on Saturday afternoon. It was on that occasion that two shots were fired by Detective Fesperman in Outing's presence. The testimony of the officers in the District Court indicates that Fesperman was standing some twenty-one feet from Outing when the shots were fired. Homberg testified that he himself had been "startled" by the shots. The North Carolina Supreme Court stated that the shooting was in violation of police regulations and that "it was highly improper, and, at best, a thoughtless blunder." State v. Outing, 255 N.C. 468, 121 S.E.2d 847, 850 (1961). Counsel for the State of North Carolina during oral argument on this appeal stated that he thought he himself would

have been frightened had someone shot a pistol in his presence under such circumstances.

Inquiry into questions concerning the voluntariness of Outing's confession must not, of course, cease with the conclusion that pistol shots were fired in his presence. Once that historical fact has been established, it then becomes our function to attempt to reconstruct "psychological" fact by inference from the "phenomenological" fact so established and to apply to the former "standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances." Culombe v. Connecticut, supra, 367 U.S. at 603, 81 S.Ct. at 1879 (opinion of Frankfurter, J., joined by Mr. Justice Stewart).

The most significant measure of the psychological effect which the shots had upon Outing does not appear to be Homberg's testimony that he himself had been startled by the shots; nor would that measure appear to reside in inference from the fact that Outing found himself accused of a crime in a wooded area in the custody of police officers, one of whom he found to be shooting a pistol. More significant than these is the fact that the testimony of the officers reveals that until the shots were fired in his presence Outing had maintained a stonewall of denial as to his own complicity in the crime although he had been accused of having been involved in it. The discovery of the knife did not cause Outing to retreat from this steadfast denial. Porter testified in the State Court that during the time when Homberg had returned to the car to radio for the identification officers (i. e., after the knife had been found but before the shots were fired), Outing still continued

in some manner" by taking him to the scene of the crime "in order to observe his reaction." It should be noted that the same jail and police headquarters as are involved in the instant case were involved in the Davis case and also that the figure of Detective Fesperman looms large in

both cases. The Davis incidents occurred in the fall of 1959—the incidents in the present case in November of 1960; and this Court first scrutinized the Davis incidents on the merits in 1964. Davis v. State of North Carolina, 339 F.2d 770 (4th Cir. 1964) (decided Dec. 8, 1964).

to maintain that someone had paid him three dollars to hide the knife. At an undetermined time after the knife was found, Fesperman arrived on the scene and five or ten minutes after his arrival fired the shots. The first break in Outing's stonewall of denial came, according to Porter's testimony, "a matter of a few minutes" after the shots when, again according to Porter, Outing said to him "I would like to talk to my wife and then tell you all about it." Accepting as a fact that the shooting was not intended as a threat, express or implied, nonetheless Outing's words immediately after the shooting vividly portray "a will overborne." Davis v. State of North Carolina, supra, 384 U.S. at 742, 86 S.Ct. 1761.

Another significant factor in analyzing the effect upon Outing of the shots is the fact of his escape Saturday evening. Prior to that time there is no evidence that Outing had made an attempt to escape. The shots, Outing's statement to Porter in the woods after the shots that he was prepared to confess, and his escape are all too clearly inextricably related to one another.

There is also nothing in the record before the Court which would affirmatively indicate that the effects of the pistol shots had been erased from Outing's mind by the time of the actual confession early Sunday morning. According to Porter the first thing Outing said Sunday morning was "that he would like to get the whole thing cleared up." Both in the District Court below and in the State Court Porter testified that Outing proved very cooperative and confessed to the crime "not very long" after they had begun to engage him in conversation. Furthermore, Outing had so implicated himself by his remark to Porter several minutes after the shots were fired and by the fact of his escape, that the interim of time between the firing of the shots

and the full confession would seem to be of little import.

### Conclusion

The process characterized in Culombe v. Connecticut, supra, 367 U.S. at 603, 81 S.Ct. 1860 of determining "psychological" fact is not an easy one and necessarily admits of divergent conclusions.[52] In this case I respectfully dissent from the holding of the majority opinion of this Court that Outing's confession was voluntarily given. No single fact or factor leads me to that conclusion. It is their cumulative weight which compels me to dissent.

**52.** Comparisons with facts in other cases discussing what constitutes "voluntariness" will seldom be of great value. Two recent decisions of this Court illustrate the difficulties of determining voluntariness in pre-*Miranda* situations. See Ledbetter v. Warden, 368 F.2d 490 (4th Cir. 1966); Smallwood v. Warden, 367 F.2d 945 (4th Cir. 1966).