**Tyrone STOKLEY**

v.

**STATE OF MARYLAND.**

**Civ. No. 19356.**

United States District Court
D. Maryland.

July 14, 1969.

Tyrone Stokley, in pro. per.

Francis B. Burch, Atty. Gen., Maryland, and H. Edgar Lentz, Asst. Atty. Gen., Baltimore, for respondent.

## MEMORANDUM AND ORDER

HARVEY, District Judge.

Represented by privately retained counsel, petitioner, Tyrone Stokley, was tried and convicted of first degree murder by Judges Cullen and Mundy sitting in the Criminal Court of Baltimore City without a jury. At the time of his arrest and trial, petitioner was 17 years of age and an eleventh grade high school student. Co-defendants Richard Briscoe and Edward Butler (both of whom were 15 years of age) were likewise tried and convicted at the same time. At the conclusion of the trial on March 13, 1956, all three defendants were sentenced by Judge Mundy to life imprisonment. No direct appeal was taken by petitioner from this judgment and sentence.

Some ten years later, petitioner and co-defendant Briscoe filed an application in the Criminal Court of Baltimore City seeking relief under the Maryland Post Conviction Procedure Act. An attorney was appointed to represent both petitioners, and evidentiary hearings were held on April 28, 1966 and on August 3, 1966 before Judge Joseph L. Carter. In his post-conviction petition, Stokley alleged (1) that the technique of his identification in court was unconstitutional; (2) that he was denied counsel at the time of his arrest; (3) that the police forced him to make a statement; (4) that his counsel was incompetent; (5) that he was held incommunicado unconstitutionally; and (6) that he was under age to be tried in the Criminal Court.

In a Memorandum Opinion filed December 28, 1966, Judge Carter discussed each of these contentions and denied petitioner relief. An application for leave to appeal was denied by the Court of Special Appeals of Maryland in a *per curiam* opinion which discussed the points that petitioner had raised below as well as some new points which he had presented for the first time at the appeal. Briscoe v. Warden, 3 Md.App. 182, 238 A.2d 304 (1968).[1]

Petitioner now seeks habeas corpus relief in this Court. He claims (1) that the State introduced in evidence against him a confession which was illegally obtained; (2) that an illegal line-up was held at the time of his arrest; (3) that his counsel was incompetent; and (4) that there were defects in his state post-conviction hearing. Pursuant to a show cause order, the Attorney General of Maryland has filed an answer attaching copies of the transcript of petitioner's original trial held on March 12 and 13, 1956, of the transcripts of the post-conviction hearing before Judge Carter on April 28 and August 3, 1966, of Judge Carter's Memorandum Opinion of December 28, 1966, and of the *per curiam* opinion of the Court of Special Appeals of Maryland filed February 16, 1968.

From the trial transcript, it appears that 50-year old Lewis Pristoop operated with his wife a neighborhood grocery store located at 1301 North Stricker Street, Baltimore, Maryland. On Christmas Eve of 1955, at about 9:30 P.M., both husband and wife were tending the store together. Mrs. Pristoop was in the corner when she heard the door open followed by mumbling. She turned around and at the same time heard a shot and saw her husband fall. She saw several negro boys running out of the store. Mr. Pristoop later died of a gunshot wound of the head, the bullet entering above his left eyebrow and having passed from the front to the back.

Petitioner, who lived in the same block at 1123 North Stricker Street, was arrested on the morning of January 7, 1956 and taken to the Northwestern Police Station. After some four hours of interrogation, he signed a written confession

---

1. Although denying relief to Stokley, the Court of Special Appeals remanded Briscoe's case for a determination by the lower court with respect to the voluntariness of Briscoe's statement. On remand, a further hearing was held before Judge Carter who found that Briscoe's confession was also voluntary in an opinion filed on June 13, 1968. See the Clerk's file in this Court in Briscoe v. State, Civil No. 20565.

at 2:30 P.M. in which he implicated both Butler and Briscoe. Butler had been arrested the day before but had declined to give a statement. However, when confronted with petitioner's statement on January 7, Butler likewise signed a written confession at 4:45 P.M. the same afternoon. Some two hours later Briscoe also gave a confession.

All three confessions which were admitted in evidence at the trial have been made a part of the record in this proceeding. Each confession told substantially the same story except that petitioner and Briscoe stated that Butler held the pistol and shot the grocer while Butler claimed that Briscoe did the actual shooting. According to the confessions, Butler mentioned to Stokley and Briscoe at different times in the early evening of December 24, 1955 that he needed some money and was going to hold up a store. Butler knew that Fred Conway had a pistol, and through an intermediary, one James Oliver, the pistol was delivered to Butler. Butler, Stokley and Briscoe thereafter went to the vicinity of the Pristoop store where they waited outside for a while, (Briscoe's version being that they were all three sitting on the steps). They then went into the store, the shooting followed, and all three fled without taking anything from the store.

All three defendants took the stand and testified at the trial. Each confirmed the facts contained in his statement.[2] On the stand as in the statements, petitioner and Briscoe put the blame for the actual shooting on Butler while Butler testified that Briscoe held the gun. Stokley confirmed Butler's testimony that when the two first confronted each other following Stokley's confession, the latter said in Butler's presence that Briscoe had actually done the shooting. (Tr.

233–237).[3] However, Stokley further testified that the statement contained in his confession was the correct version and that his inconsistent oral statement was made because he was "kind of scared" when he was confronted with Butler. (Tr. 237).

The testimony of a number of witnesses at the trial confirmed substantial parts of the three confessions. Charlotte Thomas, a 15-year old girl who lived at 1313 North Stricker Street (about six or seven houses from the grocery store) identified the three defendants as the three boys whom she had seen sitting on the steps of Pristoop's Grocery Store between 9 o'clock and 10 o'clock that evening. She testified that she had seen the boys before on about five different occasions. She saw them sitting on the steps that evening while going to the store for a loaf of bread for her aunt who lived in an apartment above Pristoop's Grocery. The boys were there when she left her aunt's apartment and were still there when she came back with the bread. However, at about 9:45, when she was leaving her aunt's apartment to go home, the boys were gone.

Joseph Perry, a 14-year old boy who had been walking up Stricker Street between 9 o'clock and 10 o'clock on December 24, 1955, testified that he saw the three defendants running out of the grocery store at that time. He testified that he knew all three of these boys previously. He had known petitioner for three or four years because he had played basketball with him. He further testified that after he saw the three co-defendants run out of the grocery store, a lady came out of the store screaming and that a policeman then came over. Perry also testified that Butler had an object

---

2. When Butler first took the stand, he testified only as to the circumstances relating to the giving of his confession. When his objection to the introduction of such confession was overruled, he again took the stand and gave his version of the facts that led to the shooting of Lewis Pristoop.

3. References to the trial transcript are cited as "Tr.", to the April 28, 1966 post-conviction transcript as "April PCPA" and to the August 3, 1966 post-conviction transcript as "August PCPA."

in his hand but that he was not sure what it was.

Lloyd Thomas, who lived at 1313 North Stricker Street, was called as a witness by Briscoe.[4] He testified that on the evening in question he saw three boys go in the grocery store, and he identified the three defendants as the three boys in question. He further testified that Butler ("the tall one") went in first, that one of the three stayed out and that after he heard a shot fired all three boys ran past him.

James Oliver testified that Fred Conway gave him a pistol that evening and that he gave it to Butler at about 8:30 P.M. Conway confirmed this testimony and identified the pistol as the one in his possession that evening. He further testified that Butler returned the pistol to him about 10:30 P.M. that night and that there were two bullets missing. On cross-examination after being re-called to the stand, Butler testified that the 32 caliber pistol identified by Oliver and Conway looked like the gun that he got from Oliver and returned to Conway (Tr. 249).

■ Even without reference to the three confessions or the testimony of the other witnesses, the sworn testimony of the three defendants at the trial shows that under the Maryland felony-murder rule, they were all guilty as charged. However, as recently emphasized by the Supreme Court in Kaufman v. United States, 394 U.S. 217, 229, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969), this Court's inquiry does not end with a finding that petitioner was not in fact innocent of the charges against him. Rather, this Court must go on to determine if petitioner was convicted as a result of "shortcut methods in law enforcement" which violated his constitutional rights. Miller v. United States, 357 U.S. 301, 313, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

■ With reference to petitioner's second point that he was convicted as a result of his appearance in an illegal line-up, the transcript of the trial discloses that no witness who identified him at a line-up testified at the trial. The dead grocer's wife did not identify any of the three co-defendants as the boys in the store on the Christmas Eve in queston. The witness Charlotte Thomas had not been able to identify petitioner nor any of the co-defendants at a line-up, although she did identify all three at the trial. There is no indication in the record that the witness Perry had ever viewed the defendants at a line-up. Perry testified that he had known all three of the defendants for three or four years as a result of his associations with them in the neighborhood (Tr. 179, 180), and he apparently recognized them instantly when they ran out of the grocery store. Nor does it appear that Lloyd Thomas was taken to a line-up. He testified that he had seen all three defendants occasionally and knew "the tall boy" (Butler) by sight. In view of these circumstances, there is no merit to petitioner's claim that his conviction resulted from his appearance at an illegal line-up.

■ As petitioner's fourth point, he claims that there were defects in his state post-conviction hearing. Even assuming that, as claimed by petitioner, there was some infirmity in his post-conviction proceedings, petitioner would not be entitled to federal habeas corpus relief on this ground inasmuch as such a claim represents an attack on a proceeding collateral to the detention of petitioner and not on the detention itself. Lokeman v. Copinger, Civil No. 16747 (D.Md. January 22, 1968), Jackson v. Warden, Civil No. 19822, affirmed No. 12,858 (4th Cir. November 26, 1968), Noble v. Sigler, 351 F.2d 673, 678 (8th Cir. 1965), cert. den. 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966).

Points one and three of the pending petition present more substantial questions and are inter-related. At his trial, petitioner was represented by Josiah F. Henry, Jr., privately-retained counsel.

4. Lloyd Thomas had been listed as one of the State's witnesses, but he was not called to testify as a part of the State's case.

No attempt was made by Mr. Henry to prove that petitioner's confession was illegally obtained. Quite to the contrary, when the confession was introduced in evidence, no objection whatsoever was made by Mr. Henry, and petitioner even took the stand to confirm substantially all the statements contained in such confession. Petitioner contends that under such circumstances, even if it cannot be shown that his confession was illegally obtained, he was not afforded effective representation of counsel.

Mr. Henry did not testify at the post-conviction hearing before Judge Carter. An attempt was made to have him appear and testify, but he was unavailable at the time. This Court has been advised that if it scheduled a hearing in connection with the pending petition, Mr. Henry would not be able to furnish meaningful testimony concerning his representation of petitioner at the original trial in March of 1956. Mr. Henry is over 80 years of age, and no longer engages in the practice of law. It has been represented to this Court that because of his advanced age he would not have an adequate recollection of the case and therefore would be unable to be of assistance at a hearing in this Court. After a careful review of the transcript of the original trial and of the transcript of the post-conviction hearing before Judge Carter, this Court is satisfied that nothing would be gained by a further hearing as the record is at present sufficiently complete for a determination of the issues that have been raised.

■■ In determining whether petitioner's confession was in fact voluntary, this Court notes that the exacting standards for the interrogation of suspects established by Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are not controlling here because these decisions are not to be given retroactive application. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Escobedo affects only those cases in which the trial began after June 22, 1964, and Miranda applies only to cases in which the trial began after June 13, 1966. The determination to be made by this Court is whether petitioner's confession meets "[the] substantive test of voluntariness which, because of the persistence of abusive practices, has become more increasingly meticulous through the years". Johnson v. New Jersey, supra, at page 730, 86 S.Ct. at page 1779. The test to be applied here is whether petitioner's confession was given voluntarily under the "totality of the circumstances". Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Outing v. State of North Carolina, 383 F.2d 892 (4th Cir. 1967), cert. den. 390 U.S. 997, 88 S.Ct. 1201, 20 L.Ed.2d 96 (1968).

■ The issue concerning the voluntariness of petitioner's confession was litigated at the post-conviction hearing held before Judge Carter on April 28 and August 3, 1966. After hearing all of the testimony, the post-conviction judge found that petitioner was not forced to make the statement in question and that he was not held incommunicado unconstitutionally. This state court hearing meets all the requirements of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and 28 U.S.C. § 2254 (d). Judge Carter's findings are presumptively correct.

In any event, this Court has reviewed the transcript of the post-conviction hearing as well as the trial transcript so that an independent determination can be made on the question of the voluntariness of petitioner's confession. Petitioner testified at the post-conviction hearing that he was young and afraid when the police started questioning him and that the turnkey told him that he was not permitted to call his parents (August PCPA 9, 12). When asked to be specific concerning any threats that had been made against him, he merely stated that he was scared (August PCPA 12).

■■ The record in the present case discloses that petitioner's confession was

admitted into evidence at the trial without objection. Petitioner took the stand, confirmed substantially all of his confession and gave a description of the crime which was in accord with the account contained in the written statement. The record thus reveals that there is little doubt that petitioner did in fact make the statements contained in the confession admitted in evidence against him and that such statements were true. Nevertheless, petitioner's position in this Court is that his conviction should be set aside because he was compelled to give this true statement of the facts at a time when he did not wish to do so. As noted hereinabove, a petitioner in order to pursue collateral federal relief is not required to assert his innocence or to make a preliminary showing that such an application has substance. See Kaufman v. United States, *supra*. The further question is presented, however, whether any consideration at all can be given to the fact that the petitioner has admitted that the confession he gave is substantially in accord with the actual circumstances surrounding the offense. In the opinion of this Court, such a fact is indeed a part of the totality of the circumstances to be considered by the Court and is quite pertinent to the present inquiry.

▇▇▇ At page one of the confession, it appears that petitioner was advised that anything he said should be true and voluntary, that no promises of reward would be made, that he would not be threatened in any manner and that anything he said might or might not be used against him in Court. In view of petitioner's testimony both at the trial and at the post-conviction hearing that the written confession was a true statement of the facts, these statements, even though contained

in the confession itself, may be considered by the post-conviction judge and by this Court in determining voluntariness. Furthermore, Lt. Klemmick, one of the police officers present at the interrogation, testified that no force or violence was used upon petitioner, that no promises or threats were made to him and that no inducements were held out to him in order to secure his statement.

▇▇▇ In considering the totality of all the circumstances, the Court notes that petitioner was 17 years of age at the time of his confession and was a student in the eleventh grade of high school. Youth by itself is not a ground for holding a confession inadmissible. Williams v. Peyton, 404 F.2d 528 (4th Cir. 1968). However, as the Court noted in that case, the record "must be scrutinized with special care to determine whether a young defendant's confession is voluntary."

There is nothing in the record to suggest that petitioner's confession was the result of suggestion or intimidation. Indeed, what he said to the police officers was true. There was no unduly long period of questioning, as he was arrested in the morning and confessed the same afternoon following interrogation for less than four hours.[5] He did not complain of physical mistreatment nor of the deprivation of food or rest.[6] At no time while on the stand during his trial did he complain that the confession was involuntary. Furthermore, at the post-conviction hearing, he testified that he gave the statement only after the police told him that they had a witness and said that they had found the gun. (August PCPA 10, 11).

Decisions such as Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224

---

5. During this four hour period, a line-up was held. The interrogation was therefore not continuous for the entire four hour period.

6. Although Briscoe testified at the post-conviction hearing that he was threatened with the gas chamber if he did not confess (April PCPA 17) and that the police pushed him around with their hands

(August PCPA 31), petitioner denied that he was ever struck or threatened (August PCPA 31–32). Near the end of his testimony was the following colloquy with the Court (August PCPA 32):
"THE COURT: I got the impression you were afraid more because it was your first experience with the police.
"MR. STOKLEY: Yes, your Honor."

(1948), holding inadmissible statements taken from teen-age defendants, have all involved circumstances more aggravated than those here present. In the *Haley* case, the 15-year old defendant had been arrested near midnight on a charge of murder and questioned by relays of police until about 5 o'clock A.M. There was evidence that he had been beaten. His mother testified that the clothes he wore when arrested, which were exchanged two days later for clean ones brought to the jail, were torn and blood-stained and that when she first saw him five days after his arrest he was bruised and skinned. Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), involved a defendant who was 14 years of age, and whose confession was given after he had been held 5 days without seeing his parents or a lawyer and without having been brought before a judge of the Juvenile Court. In Williams v. Peyton, *supra*, the petitioner was 15 years of age and was held incommunicado for 3 days without being taken before a juvenile judge. During this period, he was questioned intermittently by the police and was give no explanation or warning of his constitutional rights.

 Even if full credence is given to petitioner's testimony that he was not permitted to call his parents, such fact alone under all the circumstances of this case would not make his confession involuntary. See Van Field v. State of Maryland, Mem.Dec. No. 11,993 (4th Cir. January 27, 1969); State v. Hance, 2 Md.App. 162, 168, 233 A.2d 326 (1967). This Court concludes that petitioner confessed not because of physical or psychological coercion but because he was convinced of the strength of the state's case against him after being informed by the police that a witness had seen him leave the store and that the gun had been recovered. As the Fourth Circuit Court of Appeals said in the *Outing* case, *supra*, 383 F.2d at page 896, the indicia of coercion here "are minimal when contrasted with the comparatively aggravated circumstances which the Supreme Court has found to compel an ultimate inference of involuntariness." When all of the facts are considered and after scrutinizing the record with special care, this Court concludes, as did the post-conviction judge, that the confession was not illegally obtained.

 The final point made by petitioner is that he was denied effective representation of counsel. In Root v. Cunningham, 344 F.2d 1, at page 3 (4th Cir. 1965), the Court said the following:

"Moreover, it may be said that, while a defendant is undeniably entitled to a fair trial according to the law of the land, yet he is not guaranteed a perfect one, and where an attorney gives his client his complete loyalty and serves his cause in good faith and to the best of his ability, the due process requirement for effective assistance of counsel is generally met. Johns v. Smyth, 176 F.Supp. 949 (E.D.Va.1959); Morton v. Welch, 162 F.2d 840 (4th Cir. 1947)."

In the more recent case of Coles v. Peyton, 389 F.2d 224, at page 226 (4th Cir. 1968), the Fourth Circuit Court of Appeals discussed more specifically the steps that counsel should undertake to provide competent representation:

"To support our conclusion that petitioner is entitled to a writ of habeas corpus, we need look only to the principles to be distilled from Twiford v. Peyton, 372 F.2d 670 (4 Cir. 1967); Martin v. Commonwealth of Virginia, 365 F.2d 549 (4 Cir. 1966); Braxton v. Peyton, 365 F.2d 563 (4 Cir. 1966); and earlier authorities, and apply them to the facts of this case. The principles may be simply stated: Counsel for an indigent defendant should be appointed promptly. Counsel should be afforded a reasonable opportunity to prepare to defend an accused. Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable. Counsel must conduct appropriate in-

vestigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial. An omission or failure to abide by these requirements constitutes a denial of effective representation of counsel unless the state, on which is cast the burden of proof once a violation of these precepts is shown, can establish lack of prejudice thereby."

Petitioner's testimony at the post-conviction hearing demonstrates no failure by his attorney to abide by these requirements. Mr. Henry was privately retained by petitioner's parents to represent him. He first talked to petitioner at the police station two days after the arrest, a date which was more than two months prior to trial. Although petitioner has alleged that his attorney failed to make the necessary factual investigation of the circumstances surrounding his confession, petitioner and his attorney met on four or five occasions prior to trial for periods of two to two and one-half hours each.[7] The testimony further reveals that the discussions on these occasions concerned petitioner's statement and his involvement in the robbery. At the post-conviction hearing, petitioner testified as follows (August PCPA 13):

"Q Did he [Mr. Henry] ever ask you about the statement that you had signed for the police?

"A He asked me about the statement.

"Q What did he ask you about it?

"A He asked me did I tell what I told the police and I told him yes, and he say that—he told me he would go downtown and look into it, you know."

The record shows that Mr. Henry's strategy was to prove that petitioner, although he was in the company of the other two boys on the Christmas Eve in question, remained outside (or almost outside) the store at the time of the shooting.[8] The trial strategy employed by Mr. Henry was precisely the same as that adopted by Briscoe's court-appointed counsel, John C. Weiss, Jr., At the post-conviction hearing, Mr. Weiss described this approach as follows (August PCPA 35–36):

"* * * [A]nd I finally evolved a theory of defense in the case which was based on a set of facts like this—that the one that he said did the shooting, that is Butler, although the youngest was the most aggressive and the real planner of the crime, and that he and the other Defendant here were sort of completely dominated by Butler or drawn into the crime by him; that they had no intention of participating in the crime in the first place, but Butler had gotten the gun, gotten them to go with him and told them how the crime would be carried out—that is, they would all wear masks, go in, he would hold up the grocer with the gun, these two would rifle the cash register and the grocer's pockets, but he and the other Defendant here, before they got to the store, had tried to balk at this and that they were not intending to go through with the crime. Only Butler intended to go through with it, and he was the one with the gun, so they did not actually go in the store and they were trying to get Butler to come out of the store when Butler shot the grocer and the shooting may not even have been intentional on the part of Butler. This was the theory of defense I was following, and I went out and interviewed all the State's witnesses— * * *."

Obviously, Mr. Henry hoped that by not objecting to the introduction of the confession and by putting petitioner on the stand to confirm most of the facts set forth in such confession, he might be able

---

7. Some eight to twelve and one-half hours were thus spent in pre-trial consultations.

8. In his confession, petitioner stated that he went in the store but at the trial the explanation apparently was to be offered that he went only part way in.

to gain an acquittal for his client, or at least show such a mitigation of the circumstances that (1) petitioner might re-receive a lesser sentence than the other two co-defendants and that (2) in any event he would avoid the death penalty. In his opening statement, Mr. Henry stressed petitioner's age, his church-going habits, his industriousness and his lack of any prior record. He further said the following (Tr. 212):

" * * * When they got to Stricker Street they set on the steps for a while and had a conference on the steps. This defendant Stokely told Butler and Briscoe that he had never been in any trouble before, which the record will disclose that he hasn't and he was afraid. He was then told that he was chicken and was given the command 'Let's go'. Proceed. And then he accepted the challenge and they proceeded to go into Mr. Pristoop's store, corner of Stricker and Laurens Streets. Butler goes in first. Butler had the weapon. Briscoe goes in second. Thirdly, Stokely goes in. An instant after they went in, a shot was fired and they all ran out." [9]

Petitioner's attorney was faced with a strong case for the prosecution even if the confession were excluded. One witness placed petitioner in the vicinity of the grocery store shortly before the murder. Another witness was to testify that Butler and one of the defendants went into the store, although he was unable to say which one of the boys remained outside. A third witness who knew each of the defendants was to testify that he saw all three run out of the grocery store on the night in question followed by a lady screaming. Finally, the witnesses Oliver and Conway were to relate the manner in which the pistol was given to Butler at about 8:30 P.M. and returned to Conway at about 10:30 P.M. with two of the five bullets missing. The strength of the prosecution case was apparently made known to Mr. Henry when he discussed the case "downtown" with the police officers.

Faced with such a strong case for the prosecution, it cannot be said that the tactics adopted by Mr. Henry deprived petitioner of the effective assistance of counsel to such an extent that he was denied his constitutional rights at his trial. Indeed, it appears that when petitioner took the stand and testified at his trial, his testimony was not what his attorney had expected nor what petitioner had told his attorney in the course of preparing for trial. Having taken the stand after being sworn, petitioner surprisingly admitted that he *did* go in the store, that he went in the store to take something, and that it was "everybody's idea" to go in this store.[10] Briscoe's attorney was similarly surprised by the testimony as it developed. Mr. Weiss described his reaction as follows (August PCPA 37–38):

" * * * Well, all the witnesses were excluded from the court room in the trial and the testimony went along as expected, and then I—and I had talked this over with Briscoe just that morning in the lockup downstairs that he would take the stand and he would explain just how this set of facts had occurred. When he got on the stand, he did just the opposite to my complete surprise, as I explained to the Court in my closing argument. *Both of these Defendants got on the stand and completely incriminated themselves, which was a complete surprise to counsel*, and they insisted that all three were equal-

---

9. Mr. Henry also mentioned that he intended to prove that petitioner was "retarded". However, no such proof was ever offered. Indeed, petitioner's own testimony was to the effect that he had finished the tenth grade in high school and was in the eleventh grade at the time of his arrest (Tr. 214).

10. Mr. Henry's questions at pages 226–230 of the transcript indicate that he expected the petitioner to testify that he did not go inside the store and had no intention of taking anything while standing near the entrance to the store.

ly guilty, and they had actually gone in the store and—well, I asked leading questions about whether he intended to take part in the hold-up, and the most he would say was he didn't know." (Emphasis added)

Neither Mr. Henry nor Mr. Weiss expected the candor with which their clients testified during the direct examination.[11] At the conclusion of the trial, Judge Mundy made this comment (Tr. 265):

" * * * The case has been well presented by both the State and the defense counsel. The defense counsel have lived up to the highest standards of the bar; in that they have thoroughly and industriously prepared their cases and graciously and efficiently presented them in Court."

After a careful consideration of the entire record, this Court is satisfied that the efforts undertaken by Mr. Henry on behalf of petitioner were not so inadequate as to deny petitioner his constitutional right to effective representation of counsel. As the Court said in Root v. Cunningham, *supra*, at page 3:

"Ordinarily, one is deprived of effective assistance of counsel only in those extreme instances where the representation is so transparently inadequate as to make a farce of the trial. Snead v. Smyth, 273 F.2d 838 (4th Cir. 1959). *This is especially true where, as here, the defendant chose and employed his own counsel.*" (Emphasis added)

For the reasons stated, it is this 14th day of July, 1969,

Ordered:

1. That leave to file in forma pauperis is hereby granted;

2. That the petition for a writ of habeas corpus be and the same is hereby denied.

---

11. At petitioner's request, Mr. Henry had summoned several witnesses who were present in the court room during the trial. (August PCPA 24–26) However, after petitioner took the stand and admitted the crime, these witnesses were not called to the stand.